UNITED STATES *v.* MORRISON ET AL.

No. 99–5.   Argued January 11, 2000—Decided May 15, 2000*

---

*Together with No. 99–29, *Brzonkala* v. *Morrison et al.,* also on certiorari to the same court.

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. THOMAS, J., filed a concurring opinion, *post*, p. 627. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post*, p. 628. BREYER, J., filed a dissenting opinion, in which STEVENS, J., joined, and in which SOUTER and GINSBURG, JJ., joined as to Part I-A, *post*, p. 655.

*Solicitor General Waxman* argued the cause for the United States in No. 99–5. With him on the briefs were *Acting Assistant Attorney General Ogden, Deputy Solicitor General Underwood, Barbara McDowell, Mark B. Stern, Alisa B. Klein,* and *Anne Murphy. Julie Goldsheid* argued the cause for petitioner in No. 99–29. With her on the briefs were *Martha F. Davis, Eileen N. Wagner, Carter G. Phillips, Richard D. Bernstein, Katherine L. Adams, Jacqueline Gerson Cooper,* and *Paul A. Hemmersbaugh.*

*Michael E. Rosman* argued the cause for respondents in both cases. With him on the brief for respondent Morrison were *Hans F. Bader* and *W. David Paxton. Joseph Graham Painter, Jr.,* filed a brief for respondent Crawford.†

†Briefs of *amici curiae* urging reversal were filed for the State of Arizona et al. by *Janet Napolitano,* Attorney General of Arizona, *Eliot Spitzer,* Attorney General of New York, *Preeta D. Bansal,* Solicitor General, *Jennifer K. Brown,* Assistant Attorney General, and *Paula S. Bickett,* and by the Attorneys General for their respective jurisdictions as fol-

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In these cases we consider the constitutionality of 42 U. S. C. § 13981, which provides a federal civil remedy for the

lows: *Bruce M. Botelho* of Alaska, *Mark Pryor* of Arkansas, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Thurbert E. Baker* of Georgia, *Earl I. Anzai* of Hawaii, *James E. Ryan* of Illinois, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Albert Benjamin "Ben" Chandler III* of Kentucky, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Mike Hatch* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *Patricia A. Madrid* of New Mexico, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Jose A. Fuentes Agostini* of Puerto Rico, *Sheldon Whitehouse* of Rhode Island, *Paul G. Summers* of Tennessee, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.,* of West Virginia, and *James E. Doyle* of Wisconsin; for the Association of Trial Lawyers of America by *Jeffrey Robert White;* for AYUDA, Inc., et al. by *Laura A. Foggan* and *Clifford M. Sloan;* for the Bar of the City of New York by *Leon Friedman, Ronald J. Tabak, Louis A. Craco, Jr., Greg Harris,* and *James F. Parver;* for Equal Rights Advocates et al. by *David S. Ettinger, Lisa R. Jaskol,* and *Mary-Christine Sungaila;* for International Law Scholars and Human Rights Experts by *Peter Weiss* and *Rhonda Copelon;* for the Lawyers' Committee for Civil Rights Under Law et al. by *Norman Redlich, Marc D. Stern, Daniel F. Kolb, Barbara Arnwine, Thomas J. Henderson, Jeffrey Sinensky, Steven Freeman, Melvin Shralow, Eliot Mincberg,* and *Nadine Taub;* for Law Professors by *Bruce Ackerman, Vicki C. Jackson,* and *Judith Resnik;* for the National Network to End Domestic Violence et al. by *Bruce D. Sokler;* and for *Joseph R. Biden, Jr., pro se.*

Briefs of *amici curiae* urging affirmance were filed for the State of Alabama by *Bill Pryor,* Attorney General, *John J. Park, Jr.,* Assistant Attorney General, and *Jeffrey S. Sutton;* for the Institute for Justice et al. by *Richard A. Epstein, William H. Mellor, Clint Bolick, Scott G. Bullock, Timothy Lynch,* and *Robert A. Levy;* for the Claremont Institute Center for Constitutional Jurisprudence by *Edwin Meese III;* for the Clarendon Foundation by *Jay S. Bybee* and *Ronald D. Maines;* for the Eagle Forum Education & Legal Defense Fund by *Erik S. Jaffe* and *Phyllis Schlafly;* for the Independent Women's Forum by *Anita K. Blair, E. Duncan*

victims of gender-motivated violence. The United States Court of Appeals for the Fourth Circuit, sitting en banc, struck down § 13981 because it concluded that Congress lacked constitutional authority to enact the section's civil remedy. Believing that these cases are controlled by our decisions in *United States* v. *Lopez,* 514 U. S. 549 (1995), *United States* v. *Harris,* 106 U. S. 629 (1883), and the *Civil Rights Cases,* 109 U. S. 3 (1883), we affirm.

## I

Petitioner Christy Brzonkala enrolled at Virginia Polytechnic Institute (Virginia Tech) in the fall of 1994. In September of that year, Brzonkala met respondents Antonio Morrison and James Crawford, who were both students at Virginia Tech and members of its varsity football team. Brzonkala alleges that, within 30 minutes of meeting Morrison and Crawford, they assaulted and repeatedly raped her. After the attack, Morrison allegedly told Brzonkala, "You better not have any . . . diseases." Complaint ¶ 22. In the months following the rape, Morrison also allegedly announced in the dormitory's dining room that he "like[d] to get girls drunk and . . . ." *Id.,* ¶ 31. The omitted portions, quoted verbatim in the briefs on file with this Court, consist of boasting, debased remarks about what Morrison would do to women, vulgar remarks that cannot fail to shock and offend.

Brzonkala alleges that this attack caused her to become severely emotionally disturbed and depressed. She sought assistance from a university psychiatrist, who prescribed

*Getchell, Jr., J. William Boland,* and *Robert L. Hodges;* for the National Association of Criminal Defense Lawyers by *Theodore M. Cooperstein* and *Lisa Kemler;* for the Pacific Legal Foundation by *Anne M. Hayes* and *M. Reed Hopper;* for the Women's Freedom Network by *Robert L. King;* and for Rita Gluzman by *Alan E. Untereiner.*

*Michael P. Farris* filed a brief for the Center for the Original Intent of the Constitution as *amicus curiae.*

antidepressant medication. Shortly after the rape Brzon-kala stopped attending classes and withdrew from the university.

In early 1995, Brzonkala filed a complaint against respond-ents under Virginia Tech's Sexual Assault Policy. During the school-conducted hearing on her complaint, Morrison admitted having sexual contact with her despite the fact that she had twice told him "no." After the hearing, Vir-ginia Tech's Judicial Committee found insufficient evidence to punish Crawford, but found Morrison guilty of sexual assault and sentenced him to immediate suspension for two semesters.

Virginia Tech's dean of students upheld the judicial com-mittee's sentence. However, in July 1995, Virginia Tech in-formed Brzonkala that Morrison intended to initiate a court challenge to his conviction under the Sexual Assault Policy. University officials told her that a second hearing would be necessary to remedy the school's error in prosecuting her complaint under that policy, which had not been widely cir-culated to students. The university therefore conducted a second hearing under its Abusive Conduct Policy, which was in force prior to the dissemination of the Sexual Assault Policy. Following this second hearing the Judicial Commit-tee again found Morrison guilty and sentenced him to an identical 2-semester suspension. This time, however, the description of Morrison's offense was, without explanation, changed from "sexual assault" to "using abusive language."

Morrison appealed his second conviction through the university's administrative system. On August 21, 1995, Virginia Tech's senior vice president and provost set aside Morrison's punishment. She concluded that it was "'ex-cessive when compared with other cases where there has been a finding of violation of the Abusive Conduct Policy,'" *Brzonkala* v. *Virginia Polytechnic Institute and State Univ.*, 132 F. 3d 950, 955 (CA4 1997). Virginia Tech did not inform Brzonkala of this decision. After learning from a

newspaper that Morrison would be returning to Virginia Tech for the fall 1995 semester, she dropped out of the university.

In December 1995, Brzonkala sued Morrison, Crawford, and Virginia Tech in the United States District Court for the Western District of Virginia. Her complaint alleged that Morrison's and Crawford's attack violated § 13981 and that Virginia Tech's handling of her complaint violated Title IX of the Education Amendments of 1972, 86 Stat. 373–375, 20 U. S. C. §§ 1681–1688. Morrison and Crawford moved to dismiss this complaint on the grounds that it failed to state a claim and that § 13981's civil remedy is unconstitutional. The United States, petitioner in No. 99–5, intervened to defend § 13981's constitutionality.

The District Court dismissed Brzonkala's Title IX claims against Virginia Tech for failure to state a claim upon which relief can be granted. See *Brzonkala v. Virginia Polytechnic and State Univ.,* 935 F. Supp. 772 (WD Va. 1996). It then held that Brzonkala's complaint stated a claim against Morrison and Crawford under § 13981, but dismissed the complaint because it concluded that Congress lacked authority to enact the section under either the Commerce Clause or § 5 of the Fourteenth Amendment. *Brzonkala v. Virginia Polytechnic and State Univ.,* 935 F. Supp. 779 (WD Va. 1996).

A divided panel of the Court of Appeals reversed the District Court, reinstating Brzonkala's § 13981 claim and her Title IX hostile environment claim.[1] *Brzonkala v. Virginia Polytechnic and State Univ.,* 132 F. 3d 949 (CA4 1997). The full Court of Appeals vacated the panel's opinion and reheard the case en banc. The en banc court then issued an opinion affirming the District Court's conclusion that Brzonkala stated a claim under § 13981 because her complaint alleged a crime of violence and the allegations of Morrison's crude and derogatory statements regarding his

---

[1] The panel affirmed the dismissal of Brzonkala's Title IX disparate treatment claim. See 132 F. 3d, at 961–962.

treatment of women sufficiently indicated that his crime was motivated by gender animus.[2]  Nevertheless, the court by a divided vote affirmed the District Court's conclusion that Congress lacked constitutional authority to enact § 13981's civil remedy.  *Brzonkala* v. *Virginia Polytechnic and State Univ.*, 169 F. 3d 820 (CA4 1999).  Because the Court of Appeals invalidated a federal statute on constitutional grounds, we granted certiorari.  527 U. S. 1068 (1999).

Section 13981 was part of the Violence Against Women Act of 1994, § 40302, 108 Stat. 1941–1942.  It states that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender."  42 U. S. C. § 13981(b).  To enforce that right, subsection (c) declares:

> "A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate."

Section 13981 defines a "crim[e] of violence motivated by gender" as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an

---

[2] The en banc Court of Appeals affirmed the District Court's conclusion that Brzonkala failed to state a claim alleging disparate treatment under Title IX, but vacated the District Court's dismissal of her hostile environment claim and remanded with instructions for the District Court to hold the claim in abeyance pending this Court's decision in *Davis* v. *Monroe County Bd. of Ed.*, 526 U. S. 629 (1999).  *Brzonkala* v. *Virginia Polytechnic and State Univ.*, 169 F. 3d 820, 827, n. 2 (CA4 1999).  Our grant of certiorari did not encompass Brzonkala's Title IX claims, and we thus do not consider them in this opinion.

animus based on the victim's gender." § 13981(d)(1). It also provides that the term "crime of violence" includes any

"(A) . . . act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of Title 18, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction and whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States; and

"(B) includes an act or series of acts that would constitute a felony described in subparagraph (A) but for the relationship between the person who takes such action and the individual against whom such action is taken." § 13981(d)(2).

Further clarifying the broad scope of § 13981's civil remedy, subsection (e)(2) states that "[n]othing in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action under subsection (c) of this section." And subsection (e)(3) provides a § 13981 litigant with a choice of forums: Federal and state courts "shall have concurrent jurisdiction" over complaints brought under the section.

Although the foregoing language of § 13981 covers a wide swath of criminal conduct, Congress placed some limitations on the section's federal civil remedy. Subsection (e)(1) states that "[n]othing in this section entitles a person to a cause of action under subsection (c) of this section for random acts of violence unrelated to gender or for acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender." Subsection (e)(4) further states that § 13981 shall not be construed "to confer on the courts of the United States jurisdiction over any State law claim seeking

the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree."

Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution. "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury* v. *Madison,* 1 Cranch 137, 176 (1803) (Marshall, C. J.). Congress explicitly identified the sources of federal authority on which it relied in enacting § 13981. It said that a "Federal civil rights cause of action" is established "[p]ursuant to the affirmative power of Congress . . . under section 5 of the Fourteenth Amendment to the Constitution, as well as under section 8 of Article I of the Constitution." 42 U. S. C. § 13981(a). We address Congress' authority to enact this remedy under each of these constitutional provisions in turn.

## II

Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds. See *United States* v. *Lopez,* 514 U. S., at 568, 577–578 (KENNEDY, J., concurring); *United States* v. *Harris,* 106 U. S., at 635. With this presumption of constitutionality in mind, we turn to the question whether § 13981 falls within Congress' power under Article I, § 8, of the Constitution. Brzonkala and the United States rely upon the third clause of the section, which gives Congress power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

As we discussed at length in *Lopez,* our interpretation of the Commerce Clause has changed as our Nation has developed. See 514 U. S., at 552–557; *id.,* at 568–574 (KENNEDY, J., concurring); *id.,* at 584, 593–599 (THOMAS, J., concurring). We need not repeat that detailed review of

the Commerce Clause's history here; it suffices to say that, in the years since *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937), Congress has had considerably greater latitude in regulating conduct and transactions under the Commerce Clause than our previous case law permitted. See *Lopez*, 514 U. S., at 555–556; *id.*, at 573–574 (KENNEDY, J., concurring).

*Lopez* emphasized, however, that even under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds. *Id.*, at 557.

> "[E]ven [our] modern-era precedents which have expanded congressional power under the Commerce Clause confirm that this power is subject to outer limits. In *Jones & Laughlin Steel*, the Court warned that the scope of the interstate commerce power 'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.'" *Id.*, at 556–557 (quoting *Jones & Laughlin Steel, supra*, at 37).[3]

As we observed in *Lopez*, modern Commerce Clause jurisprudence has "identified three broad categories of activity that Congress may regulate under its commerce power."

---

[3] JUSTICE SOUTER's dissent takes us to task for allegedly abandoning *Jones & Laughlin Steel* in favor of an inadequate "federalism of some earlier time." *Post*, at 641–643, 655. As the foregoing language from *Jones & Laughlin Steel* makes clear however, this Court has always recognized a limit on the commerce power inherent in "our dual system of government." 301 U. S., at 37. It is the dissent's remarkable theory that the commerce power is without judicially enforceable boundaries that disregards the Court's caution in *Jones & Laughlin Steel* against allowing that power to "effectually obliterate the distinction between what is national and what is local." *Ibid.*

514 U. S., at 558 (citing *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264, 276–277 (1981); *Perez* v. *United States,* 402 U. S. 146, 150 (1971)). "First, Congress may regulate the use of the channels of interstate commerce." 514 U. S., at 558 (citing *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 256 (1964); *United States* v. *Darby,* 312 U. S. 100, 114 (1941)). "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U. S., at 558 (citing *Shreveport Rate Cases,* 234 U. S. 342 (1914); *Southern R. Co.* v. *United States,* 222 U. S. 20 (1911); *Perez, supra,* at 150). "Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, . . . *i. e.,* those activities that substantially affect interstate commerce." 514 U. S., at 558–559 (citing *Jones & Laughlin Steel, supra,* at 37).

Petitioners do not contend that these cases fall within either of the first two of these categories of Commerce Clause regulation. They seek to sustain § 13981 as a regulation of activity that substantially affects interstate commerce. Given § 13981's focus on gender-motivated violence wherever it occurs (rather than violence directed at the instrumentalities of interstate commerce, interstate markets, or things or persons in interstate commerce), we agree that this is the proper inquiry.

Since *Lopez* most recently canvassed and clarified our case law governing this third category of Commerce Clause regulation, it provides the proper framework for conducting the required analysis of § 13981. In *Lopez,* we held that the Gun-Free School Zones Act of 1990, 18 U. S. C. § 922(q)(1)(A), which made it a federal crime to knowingly possess a firearm in a school zone, exceeded Congress' authority under the Commerce Clause. See 514 U. S., at 551. Several significant considerations contributed to our decision.

First, we observed that § 922(q) was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.*, at 561. Reviewing our case law, we noted that "we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce." *Id.*, at 559. Although we cited only a few examples, including *Wickard* v. *Filburn*, 317 U. S. 111 (1942); *Hodel, supra; Perez, supra; Katzenbach* v. *McClung*, 379 U. S. 294 (1964); and *Heart of Atlanta Motel, supra*, we stated that the pattern of analysis is clear. *Lopez*, 514 U. S., at 559–560. "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.*, at 560.

Both petitioners and JUSTICE SOUTER's dissent downplay the role that the economic nature of the regulated activity plays in our Commerce Clause analysis. But a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case. See, *e. g., id.*, at 551 ("The Act [does not] regulat[e] a commercial activity"), 560 ("Even *Wickard*, which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not"), 561 ("Section 922(q) is not an essential part of a larger regulation of economic activity"), 566 ("Admittedly, a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty. But, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the Commerce Clause always will engender 'legal uncertainty' "), 567 ("The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition

elsewhere, substantially affect any sort of interstate commerce"); see also *id.*, at 573–574 (KENNEDY, J., concurring) (stating that *Lopez* did not alter our "practical conception of commercial regulation" and that Congress may "regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy"), 577 ("Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur"), 580 ("[U]nlike the earlier cases to come before the Court here neither the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute has an evident commercial nexus. The statute makes the simple possession of a gun within 1,000 feet of the grounds of the school a criminal offense. In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far" (citation omitted)). *Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor. See *id.*, at 559–560.[4]

The second consideration that we found important in analyzing § 922(q) was that the statute contained "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have

---

[4] JUSTICE SOUTER's dissent does not reconcile its analysis with our holding in *Lopez* because it apparently would cast that decision aside. See *post,* at 637–643. However, the dissent cannot persuasively contradict *Lopez*'s conclusion that, in every case where we have sustained federal regulation under the aggregation principle in *Wickard* v. *Filburn,* 317 U. S. 111 (1942), the regulated activity was of an apparent commercial character. See, *e. g., Lopez,* 514 U. S., at 559–560, 580.

an explicit connection with or effect on interstate commerce." *Id.*, at 562. Such a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce.

Third, we noted that neither § 922(q) " 'nor its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone.' " *Ibid.* (quoting Brief for United States, O. T. 1994, No. 93–1260, pp. 5–6). While "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," 514 U. S., at 562 (citing *McClung, supra,* at 304; *Perez,* 402 U. S., at 156), the existence of such findings may "enable us to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye." 514 U. S., at 563.

Finally, our decision in *Lopez* rested in part on the fact that the link between gun possession and a substantial effect on interstate commerce was attenuated. *Id.*, at 563–567. The United States argued that the possession of guns may lead to violent crime, and that violent crime "can be expected to affect the functioning of the national economy in two ways. First, the costs of violent crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population. Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe." *Id.*, at 563–564 (citation omitted). The Government also argued that the presence of guns at schools poses a threat to the educational process, which in turn threatens to produce a less efficient and productive work force, which will negatively affect national productivity and thus interstate commerce. *Ibid.*

We rejected these "costs of crime" and "national productivity" arguments because they would permit Congress

to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." *Id.*, at 564. We noted that, under this but-for reasoning:

> "Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the[se] theories . . . , it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." *Ibid.*

With these principles underlying our Commerce Clause jurisprudence as reference points, the proper resolution of the present cases is clear. Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity. While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature. See, *e. g.*, *id.*, at 559–560, and the cases cited therein.

Like the Gun-Free School Zones Act at issue in *Lopez*, § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce. Although *Lopez* makes clear that such a jurisdictional element would lend support to the argument that § 13981 is sufficiently tied to interstate commerce, Congress elected to cast § 13981's remedy over a wider, and more purely intrastate, body of violent crime.[5]

---

[5] Title 42 U. S. C. § 13981 is not the sole provision of the Violence Against Women Act of 1994 to provide a federal remedy for gender-motivated crime. Section 40221(a) of the Act creates a federal criminal remedy to

614

In contrast with the lack of congressional findings that we faced in *Lopez*, § 13981 *is* supported by numerous findings regarding the serious impact that gender-motivated violence has on victims and their families. See, *e. g.*, H. R. Conf. Rep. No. 103–711, p. 385 (1994); S. Rep. No. 103–138, p. 40 (1993); S. Rep. No. 101–545, p. 33 (1990). But the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. As we stated in *Lopez*, " '[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.' " 514 U. S., at 557, n. 2 (quoting *Hodel*, 452 U. S., at 311 (REHNQUIST, J., concurring in judgment)). Rather, " '[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court.' " 514 U. S., at 557, n. 2 (quoting *Heart of Atlanta Motel*, 379 U. S., at 273 (Black, J., concurring)).

---

punish "interstate crimes of abuse including crimes committed against spouses or intimate partners during interstate travel and crimes committed by spouses or intimate partners who cross State lines to continue the abuse." S. Rep. No. 103–138, p. 43 (1993). That criminal provision has been codified at 18 U. S. C. § 2261(a)(1), which states:

"A person who travels across a State line or enters or leaves Indian country with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner, shall be punished as provided in subsection (b)."

The Courts of Appeals have uniformly upheld this criminal sanction as an appropriate exercise of Congress' Commerce Clause authority, reasoning that "[t]he provision properly falls within the first of *Lopez*'s categories as it regulates the use of channels of interstate commerce—i. e., the use of the interstate transportation routes through which persons and goods move." *United States* v. *Lankford*, 196 F. 3d 563, 571–572 (CA5 1999) (collecting cases) (internal quotation marks omitted).

In these cases, Congress' findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers. Congress found that gender-motivated violence affects interstate commerce

> "by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products."   H. R. Conf. Rep. No. 103–711, at 385.

Accord, S. Rep. No. 103–138, at 54.   Given these findings and petitioners' arguments, the concern that we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded.   See *Lopez, supra*, at 564.   The reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce.   If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption.   Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

Petitioners' reasoning, moreover, will not limit Congress to regulating violence but may, as we suggested in *Lopez*, be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect of

marriage, divorce, and childrearing on the national economy is undoubtedly significant. Congress may have recognized this specter when it expressly precluded § 13981 from being used in the family law context.[6] See 42 U. S. C. § 13981(e)(4). Under our written Constitution, however, the limitation of congressional authority is not solely a matter of legislative grace.[7] See *Lopez, supra,* at 575–579 (KENNEDY, J., concurring); *Marbury,* 1 Cranch, at 176–178.

---

[6] We are not the first to recognize that the but-for causal chain must have its limits in the Commerce Clause area. In *Lopez,* 514 U. S., at 567, we quoted Justice Cardozo's concurring opinion in *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U. S. 495 (1935):

"There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.'" *Id.,* at 554 (quoting *United States* v. *A. L. A. Schechter Poultry Corp.,* 76 F. 2d 617, 624 (CA2 1935) (L. Hand, J., concurring)).

[7] JUSTICE SOUTER's theory that *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824), *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528 (1985), and the Seventeenth Amendment provide the answer to these cases, see *post,* at 645–652, is remarkable because it undermines this central principle of our constitutional system. As we have repeatedly noted, the Framers crafted the federal system of Government so that the people's rights would be secured by the division of power. See, *e. g., Arizona* v. *Evans,* 514 U. S. 1, 30 (1995) (GINSBURG, J., dissenting); *Gregory* v. *Ashcroft,* 501 U. S. 452, 458–459 (1991) (cataloging the benefits of the federal design); *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 242 (1985) ("The 'constitutionally mandated balance of power' between the States and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties'") (quoting *Garcia, supra,* at 572 (Powell, J., dissenting)). Departing from their parliamentary past, the Framers adopted a written Constitution that further divided authority at the federal level so that the Constitution's provisions would not be defined solely by the political branches nor the scope of legislative power limited only by public opinion and the Legislature's self-restraint. See, *e. g., Marbury* v. *Madison,* 1 Cranch 137, 176 (1803) (Marshall, C. J.) ("The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written"). It is thus a "'per-

We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is

manent and indispensable feature of our constitutional system'" that "'the federal judiciary is supreme in the exposition of the law of the Constitution.'" *Miller* v. *Johnson,* 515 U. S. 900, 922–923 (1995) (quoting *Cooper* v. *Aaron,* 358 U. S. 1, 18 (1958)).

No doubt the political branches have a role in interpreting and applying the Constitution, but ever since *Marbury* this Court has remained the ultimate expositor of the constitutional text. As we emphasized in *United States* v. *Nixon,* 418 U. S. 683 (1974): "In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others. . . . Many decisions of this Court, however, have unequivocally reaffirmed the holding of *Marbury* that '[i]t is emphatically the province and duty of the judicial department to say what the law is.'" *Id.,* at 703 (citation omitted).

Contrary to JUSTICE SOUTER's suggestion, see *post,* at 647–652, and n. 14, *Gibbons* did not exempt the commerce power from this cardinal rule of constitutional law. His assertion that, from *Gibbons* on, public opinion has been the only restraint on the congressional exercise of the commerce power is true only insofar as it contends that political accountability is and has been the only limit on Congress' exercise of the commerce power *within that power's outer bounds.* As the language surrounding that relied upon by JUSTICE SOUTER makes clear, *Gibbons* did not remove from this Court the authority to define that boundary. See *Gibbons, supra,* at 194–195 ("It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. . . . Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce to which the power was to be extended, would not have been made, had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State").

truly national and what is truly local. *Lopez*, 514 U. S., at 568 (citing *Jones & Laughlin Steel*, 301 U. S., at 30). In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. See, *e. g., Cohens* v. *Virginia,* 6 Wheat. 264, 426, 428 (1821) (Marshall, C. J.) (stating that Congress "has no general right to punish murder committed within any of the States," and that it is "clear . . . that congress cannot punish felonies generally"). Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.[8] See, *e. g., Lopez,* 514 U. S., at 566 ("The Constitution . . . withhold[s] from Congress a plenary police power"); *id.,* at 584–585 (THOMAS, J., concurring) ("[W]e *always* have rejected read-

---

[8] JUSTICE SOUTER disputes our assertion that the Constitution reserves the general police power to the States, noting that the Founders failed to adopt several proposals for additional guarantees against federal encroachment on state authority. See *post,* at 645–646, and n. 14. This argument is belied by the entire structure of the Constitution. With its careful enumeration of federal powers and explicit statement that all powers not granted to the Federal Government are reserved, the Constitution cannot realistically be interpreted as granting the Federal Government an unlimited license to regulate. See, *e. g., New York* v. *United States,* 505 U. S. 144, 156–157 (1992). And, as discussed above, the Constitution's separation of federal power and the creation of the Judicial Branch indicate that disputes regarding the extent of congressional power are largely subject to judicial review. See n. 7, *supra.* Moreover, the principle that "'[t]he Constitution created a Federal Government of limited powers,'" while reserving a generalized police power to the States, is deeply ingrained in our constitutional history. *New York, supra,* at 155 (quoting *Gregory* v. *Ashcroft, supra,* at 457); see also *Lopez,* 514 U. S., at 584–599 (THOMAS, J., concurring) (discussing the history of the debates surrounding the adoption of the Commerce Clause and our subsequent interpretation of the Clause); *Maryland* v. *Wirtz,* 392 U. S. 183, 196 (1968).

ings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power"), 596–597, and n. 6 (noting that the first Congresses did not enact nationwide punishments for criminal conduct under the Commerce Clause).

## III

Because we conclude that the Commerce Clause does not provide Congress with authority to enact § 13981, we address petitioners' alternative argument that the section's civil remedy should be upheld as an exercise of Congress' remedial power under § 5 of the Fourteenth Amendment. As noted above, Congress expressly invoked the Fourteenth Amendment as a source of authority to enact § 13981.

The principles governing an analysis of congressional legislation under § 5 are well settled. Section 5 states that Congress may "'enforce' by 'appropriate legislation' the constitutional guarantee that no State shall deprive any person of 'life, liberty, or property, without due process of law,' nor deny any person 'equal protection of the laws.'" *City of Boerne* v. *Flores,* 521 U. S. 507, 517 (1997). Section 5 is "a positive grant of legislative power," *Katzenbach* v. *Morgan,* 384 U. S. 641, 651 (1966), that includes authority to "prohibi[t] conduct which is not itself unconstitutional and [to] intrud[e] into 'legislative spheres of autonomy previously reserved to the States.'" *Flores, supra,* at 518 (quoting *Fitzpatrick* v. *Bitzer,* 427 U. S. 445, 455 (1976)); see also *Kimel* v. *Florida Bd. of Regents,* 528 U. S. 62, 81 (2000). However, "[a]s broad as the congressional enforcement power is, it is not unlimited." *Oregon* v. *Mitchell,* 400 U. S. 112, 128 (1970); see also *Kimel, supra,* at 81. In fact, as we discuss in detail below, several limitations inherent in § 5's text and constitutional context have been recognized since the Fourteenth Amendment was adopted.

Petitioners' § 5 argument is founded on an assertion that there is pervasive bias in various state justice systems against victims of gender-motivated violence. This asser-

tion is supported by a voluminous congressional record. Specifically, Congress received evidence that many participants in state justice systems are perpetuating an array of erroneous stereotypes and assumptions. Congress concluded that these discriminatory stereotypes often result in insufficient investigation and prosecution of gender-motivated crime, inappropriate focus on the behavior and credibility of the victims of that crime, and unacceptably lenient punishments for those who are actually convicted of gender-motivated violence. See H. R. Conf. Rep. No. 103–711, at 385–386; S. Rep. No. 103–138, at 38, 41–55; S. Rep. No. 102–197, at 33–35, 41, 43–47. Petitioners contend that this bias denies victims of gender-motivated violence the equal protection of the laws and that Congress therefore acted appropriately in enacting a private civil remedy against the perpetrators of gender-motivated violence to both remedy the States' bias and deter future instances of discrimination in the state courts.

As our cases have established, state-sponsored gender discrimination violates equal protection unless it "'serves "important governmental objectives and . . . the discriminatory means employed" are "substantially related to the achievement of those objectives."'" *United States* v. *Virginia,* 518 U. S. 515, 533 (1996) (quoting *Mississippi Univ. for Women* v. *Hogan,* 458 U. S. 718, 724 (1982), in turn quoting *Wengler* v. *Druggists Mut. Ins. Co.,* 446 U. S. 142, 150 (1980)). See also *Craig* v. *Boren,* 429 U. S. 190, 198–199 (1976). However, the language and purpose of the Fourteenth Amendment place certain limitations on the manner in which Congress may attack discriminatory conduct. These limitations are necessary to prevent the Fourteenth Amendment from obliterating the Framers' carefully crafted balance of power between the States and the National Government. See *Flores, supra,* at 520–524 (reviewing the history of the Fourteenth Amendment's enactment and discussing the contemporary belief that the Amendment "'does

not concentrate power in the general government for any purpose of police government within the States'") (quoting T. Cooley, Constitutional Limitations 294, n. 1 (2d ed. 1871)). Foremost among these limitations is the time-honored principle that the Fourteenth Amendment, by its very terms, prohibits only state action. "[T]he principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley* v. *Kraemer*, 334 U. S. 1, 13, and n. 12 (1948).

Shortly after the Fourteenth Amendment was adopted, we decided two cases interpreting the Amendment's provisions, *United States* v. *Harris*, 106 U. S. 629 (1883), and the *Civil Rights Cases*, 109 U. S. 3 (1883). In *Harris*, the Court considered a challenge to §2 of the Civil Rights Act of 1871. That section sought to punish "private persons" for "conspiring to deprive any one of the equal protection of the laws enacted by the State." 106 U. S., at 639. We concluded that this law exceeded Congress' §5 power because the law was "directed exclusively against the action of private persons, without reference to the laws of the State, or their administration by her officers." *Id.*, at 640. In so doing, we reemphasized our statement from *Virginia* v. *Rives*, 100 U. S. 313, 318 (1880), that "'these provisions of the fourteenth amendment have reference to State action exclusively, and not to any action of private individuals.'" *Harris, supra,* at 639 (misquotation in *Harris*).

We reached a similar conclusion in the *Civil Rights Cases.* In those consolidated cases, we held that the public accommodation provisions of the Civil Rights Act of 1875, which applied to purely private conduct, were beyond the scope of the §5 enforcement power. 109 U. S., at 11 ("Individual invasion of individual rights is not the subject-matter of the [Fourteenth] [A]mendment"). See also, *e. g., Romer* v.

*Evans,* 517 U. S. 620, 628 (1996) ("[I]t was settled early that the Fourteenth Amendment did not give Congress a general power to prohibit discrimination in public accommodations"); *Lugar* v. *Edmondson Oil Co.,* 457 U. S. 922, 936 (1982) ("Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power"); *Blum* v. *Yaretsky,* 457 U. S. 991, 1002 (1982); *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 172 (1972); *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144, 147, n. 2 (1970); *United States* v. *Cruikshank,* 92 U. S. 542, 554 (1876) ("The fourteenth amendment prohibits a state from depriving any person of life, liberty, or property, without due process of law; but this adds nothing to the rights of one citizen as against another. It simply furnishes an additional guaranty against any encroachment by the States upon the fundamental rights which belong to every citizen as a member of society").

The force of the doctrine of *stare decisis* behind these decisions stems not only from the length of time they have been on the books, but also from the insight attributable to the Members of the Court at that time. Every Member had been appointed by President Lincoln, Grant, Hayes, Garfield, or Arthur—and each of their judicial appointees obviously had intimate knowledge and familiarity with the events surrounding the adoption of the Fourteenth Amendment.

Petitioners contend that two more recent decisions have in effect overruled this longstanding limitation on Congress' § 5 authority. They rely on *United States* v. *Guest,* 383 U. S. 745 (1966), for the proposition that the rule laid down in the *Civil Rights Cases* is no longer good law. In *Guest,* the Court reversed the construction of an indictment under 18 U. S. C. § 241, saying in the course of its opinion that "we deal here with issues of statutory construction, not with issues of constitutional power." 383 U. S., at 749. Three Members of the Court, in a separate opinion by Justice Brennan, expressed the view that the *Civil Rights Cases*

were wrongly decided, and that Congress could under §5 prohibit actions by private individuals. 383 U. S., at 774 (opinion concurring in part and dissenting in part). Three other Members of the Court, who joined the opinion of the Court, joined a separate opinion by Justice Clark which in two or three sentences stated the conclusion that Congress could "punis[h] all conspiracies—with or without state action—that interfere with Fourteenth Amendment rights." *Id.*, at 762 (concurring opinion). Justice Harlan, in another separate opinion, commented with respect to the statement by these Justices:

> "The action of three of the Justices who joined the Court's opinion in nonetheless cursorily pronouncing themselves on the far-reaching constitutional questions deliberately not reached in Part II seems to me, to say the very least, extraordinary." *Id.*, at 762, n. 1 (opinion concurring in part and dissenting in part).

Though these three Justices saw fit to opine on matters not before the Court in *Guest*, the Court had no occasion to revisit the *Civil Rights Cases* and *Harris*, having determined "the indictment [charging private individuals with conspiring to deprive blacks of equal access to state facilities] in fact contain[ed] an express allegation of state involvement." 383 U. S., at 756. The Court concluded that the implicit allegation of "active connivance by agents of the State" eliminated any need to decide "the threshold level that state action must attain in order to create rights under the Equal Protection Clause." *Ibid.* All of this Justice Clark explicitly acknowledged. See *id.*, at 762 (concurring opinion) ("The Court's interpretation of the indictment clearly avoids the question whether Congress, by appropriate legislation, has the power to punish private conspiracies that interfere with Fourteenth Amendment rights, such as the right to utilize public facilities").

624

To accept petitioners' argument, moreover, one must add to the three Justices joining Justice Brennan's reasoned explanation for his belief that the *Civil Rights Cases* were wrongly decided, the three Justices joining Justice Clark's opinion who gave no explanation whatever for their similar view. This is simply not the way that reasoned constitutional adjudication proceeds. We accordingly have no hesitation in saying that it would take more than the naked dicta contained in Justice Clark's opinion, when added to Justice Brennan's opinion, to cast any doubt upon the enduring vitality of the *Civil Rights Cases* and *Harris*.

Petitioners also rely on *District of Columbia* v. *Carter*, 409 U. S. 418 (1973). *Carter* was a case addressing the question whether the District of Columbia was a "State" within the meaning of Rev. Stat. § 1979, 42 U. S. C. § 1983—a section which by its terms requires state action before it may be employed. A footnote in that opinion recites the same litany respecting *Guest* that petitioners rely on. This litany is of course entirely dicta, and in any event cannot rise above its source. We believe that the description of the § 5 power contained in the *Civil Rights Cases* is correct:

> "But where a subject is not submitted to the general legislative power of Congress, but is only submitted thereto for the purpose of rendering effective some prohibition against particular [s]tate legislation or [s]tate action in reference to that subject, the power given is limited by its object, and any legislation by Congress in the matter must necessarily be corrective in its character, adapted to counteract and redress the operation of such prohibited state laws or proceedings of [s]tate officers." 109 U. S., at 18.

Petitioners alternatively argue that, unlike the situation in the *Civil Rights Cases*, here there has been gender-based disparate treatment by state authorities, whereas in those cases there was no indication of such state action. There is

abundant evidence, however, to show that the Congresses that enacted the Civil Rights Acts of 1871 and 1875 had a purpose similar to that of Congress in enacting § 13981: There were state laws on the books bespeaking equality of treatment, but in the administration of these laws there was discrimination against newly freed slaves. The statement of Representative Garfield in the House and that of Senator Sumner in the Senate are representative:

> "[T]he chief complaint is not that the laws of the State are unequal, but that even where the laws are just and equal on their face, yet, by a systematic mal-administration of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them." Cong. Globe, 42d Cong., 1st Sess., App. 153 (1871) (statement of Rep. Garfield).
> "The Legislature of South Carolina has passed a law giving precisely the rights contained in your 'supplementary civil rights bill.' But such a law remains a dead letter on her statute-books, because the State courts, comprised largely of those whom the Senator wishes to obtain amnesty for, refuse to enforce it." Cong. Globe, 42d Cong., 2d Sess., 430 (1872) (statement of Sen. Sumner).

See also, e. g., Cong. Globe, 42d Cong., 1st Sess., at 653 (statement of Sen. Osborn); id., at 457 (statement of Rep. Coburn); id., at App. 78 (statement of Rep. Perry); 2 Cong. Rec. 457 (1874) (statement of Rep. Butler); 3 Cong. Rec. 945 (1875) (statement of Rep. Lynch).

But even if that distinction were valid, we do not believe it would save § 13981's civil remedy. For the remedy is simply not "corrective in its character, adapted to counteract and redress the operation of such prohibited [s]tate laws or proceedings of [s]tate officers." *Civil Rights Cases*, *supra*, at 18. Or, as we have phrased it in more recent cases, prophylactic legislation under § 5 must have a " 'congru-

ence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,* 527 U. S. 627, 639 (1999); *Flores,* 521 U. S., at 526. Section 13981 is not aimed at proscribing discrimination by officials which the Fourteenth Amendment might not itself proscribe; it is directed not at any State or state actor, but at individuals who have committed criminal acts motivated by gender bias.

In the present cases, for example, § 13981 visits no consequence whatever on any Virginia public official involved in investigating or prosecuting Brzonkala's assault. The section is, therefore, unlike any of the § 5 remedies that we have previously upheld. For example, in *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966), Congress prohibited New York from imposing literacy tests as a prerequisite for voting because it found that such a requirement disenfranchised thousands of Puerto Rican immigrants who had been educated in the Spanish language of their home territory. That law, which we upheld, was directed at New York officials who administered the State's election law and prohibited them from using a provision of that law. In *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966), Congress imposed voting rights requirements on States that, Congress found, had a history of discriminating against blacks in voting. The remedy was also directed at state officials in those States. Similarly, in *Ex parte Virginia,* 100 U. S. 339 (1880), Congress criminally punished state officials who intentionally discriminated in jury selection; again, the remedy was directed to the culpable state official.

Section 13981 is also different from these previously upheld remedies in that it applies uniformly throughout the Nation. Congress' findings indicate that the problem of discrimination against the victims of gender-motivated crimes does not exist in all States, or even most States. By contrast, the § 5 remedy upheld in *Katzenbach* v. *Morgan, supra,*

was directed only to the State where the evil found by Congress existed, and in *South Carolina* v. *Katzenbach, supra,* the remedy was directed only to those States in which Congress found that there had been discrimination.

For these reasons, we conclude that Congress' power under § 5 does not extend to the enactment of § 13981.

## IV

Petitioner Brzonkala's complaint alleges that she was the victim of a brutal assault. But Congress' effort in § 13981 to provide a federal civil remedy can be sustained neither under the Commerce Clause nor under § 5 of the Fourteenth Amendment. If the allegations here are true, no civilized system of justice could fail to provide her a remedy for the conduct of respondent Morrison. But under our federal system that remedy must be provided by the Commonwealth of Virginia, and not by the United States. The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE THOMAS, concurring.

The majority opinion correctly applies our decision in *United States* v. *Lopez,* 514 U. S. 549 (1995), and I join it in full. I write separately only to express my view that the very notion of a "substantial effects" test under the Commerce Clause is inconsistent with the original understanding of Congress' powers and with this Court's early Commerce Clause cases. By continuing to apply this rootless and malleable standard, however circumscribed, the Court has encouraged the Federal Government to persist in its view that the Commerce Clause has virtually no limits. Until this Court replaces its existing Commerce Clause jurisprudence with a standard more consistent with the original understanding, we will continue to see Congress appropriating state police powers under the guise of regulating commerce.

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

The Court says both that it leaves Commerce Clause precedent undisturbed and that the Civil Rights Remedy of the Violence Against Women Act of 1994, 42 U. S. C. § 13981, exceeds Congress's power under that Clause. I find the claims irreconcilable and respectfully dissent.[1]

I

Our cases, which remain at least nominally undisturbed, stand for the following propositions. Congress has the power to legislate with regard to activity that, in the aggregate, has a substantial effect on interstate commerce. See *Wickard* v. *Filburn*, 317 U. S. 111, 124–128 (1942); *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 277 (1981). The fact of such a substantial effect is not an issue for the courts in the first instance, *ibid.*, but for the Congress, whose institutional capacity for gathering evidence and taking testimony far exceeds ours. By passing legislation, Congress indicates its conclusion, whether explicitly or not, that facts support its exercise of the commerce power. The business of the courts is to review the congressional assessment, not for soundness but simply for the rationality of concluding that a jurisdictional basis exists in fact. See *ibid.* Any explicit findings that Congress chooses to make, though not dispositive of the question of rationality, may advance judicial review by identifying factual authority on which Congress relied. Applying those propositions in these cases can lead to only one conclusion.

One obvious difference from *United States* v. *Lopez*, 514 U. S. 549 (1995), is the mountain of data assembled by Con-

---

[1] Finding the law a valid exercise of Commerce Clause power, I have no occasion to reach the question whether it might also be sustained as an exercise of Congress's power to enforce the Fourteenth Amendment.

gress, here showing the effects of violence against women on interstate commerce.[2] Passage of the Act in 1994 was preceded by four years of hearings,[3] which included testimony from physicians and law professors;[4] from survivors

---

[2] It is true that these data relate to the effects of violence against women generally, while the civil rights remedy limits its scope to "crimes of violence motivated by gender"—presumably a somewhat narrower subset of acts. See 42 U. S. C. § 13981(b). But the meaning of "motivated by gender" has not been elucidated by lower courts, much less by this one, so the degree to which the findings rely on acts not redressable by the civil rights remedy is unclear. As will appear, however, much of the data seems to indicate behavior with just such motivation. In any event, adopting a cramped reading of the statutory text, and thereby increasing the constitutional difficulties, would directly contradict one of the most basic canons of statutory interpretation. See *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 30 (1937). Having identified the problem of violence against women, Congress may address what it sees as the most threatening manifestation; "reform may take one step at a time." *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U. S. 483, 489 (1955).

[3] See, *e. g.*, Domestic Violence: Terrorism in the Home, Hearing before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 101st Cong., 2d Sess. (1990); Women and Violence, Hearing before the Senate Committee on the Judiciary, 101st Cong., 2d Sess. (1990); Violence Against Women: Victims of the System, Hearing on S. 15 before the Senate Committee on the Judiciary, 102d Cong., 1st Sess. (1991) (S. Hearing 102–369); Violence Against Women, Hearing before the Subcommittee on Crime and Criminal Justice of the House Committee on the Judiciary, 102d Cong., 2d Sess. (1992); Hearing on Domestic Violence, Hearing before the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993); Violent Crimes Against Women, Hearing before the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993); Violence Against Women: Fighting the Fear, Hearing before the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993) (S. Hearing 103–878); Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess. (1993); Domestic Violence: Not Just a Family Matter, Hearing before the Subcommittee on Crime and Criminal Justice of the House Committee on the Judiciary, 103d Cong., 2d Sess. (1994).

[4] See, *e. g.*, S. Hearing 103–596, at 1–4 (testimony of Northeastern Univ. Law School Professor Clare Dalton); S. Hearing 102–369, at 103–105 (testimony of Univ. of Chicago Professor Cass Sunstein); S. Hearing 103–878,

of rape and domestic violence;[5] and from representatives
of state law enforcement and private business.[6]  The record
includes reports on gender bias from task forces in 21
States,[7] and we have the benefit of specific factual findings

at 7–11 (testimony of American Medical Assn. president-elect Robert
McAfee).

[5] See, e. g., id., at 13–17 (testimony of Lisa); id., at 40–42 (testimony of
Jennifer Tescher).

[6] See, e. g., S. Hearing 102–369, at 24–36, 71–87 (testimony of attor-
neys general of Iowa and Illinois); id., at 235–245 (testimony of National
Federation of Business and Professional Women); S. Hearing No. 103–
596, at 15–17 (statement of James Hardeman, Manager, Counseling Dept.,
Polaroid Corp.).

[7] See Judicial Council of California Advisory Committee on Gender Bias
in the Courts, Achieving Equal Justice for Women and Men in the Califor-
nia Courts (July 1996) (edited version of 1990 report); Colorado Supreme
Court Task Force on Gender Bias in the Courts, Gender and Justice in the
Colorado Courts (1990); Connecticut Task Force on Gender, Justice and
the Courts, Report to the Chief Justice (Sept. 1991); Report of the Florida
Supreme Court Gender Bias Study Commission (Mar. 1990); Supreme
Court of Georgia, Commission on Gender Bias in the Judicial System, Gen-
der and Justice in the Courts (1991), reprinted in 8 Ga. St. U. L. Rev. 539
(1992); Report of the Illinois Task Force on Gender Bias in the Courts
(1990); Equality in the Courts Task Force, State of Iowa, Final Report
(Feb. 1993); Kentucky Task Force on Gender Fairness in the Courts, Equal
Justice for Women and Men (Jan. 1992); Louisiana Task Force on Women
in the Courts, Final Report (1992); Maryland Special Joint Comm., Gender
Bias in the Courts (May 1989); Massachusetts Supreme Judicial Court,
Gender Bias Study of the Court System in Massachusetts (1989); Michigan
Supreme Court Task Force on Gender Issues in the Courts, Final Report
(Dec. 1989); Minnesota Supreme Court Task Force for Gender Fairness in
the Courts, Final Report (1989), reprinted in 15 Wm. Mitchell L. Rev. 825
(1989); Nevada Supreme Court Gender Bias Task Force, Justice for Women
(1988); New Jersey Supreme Court Task Force on Women in the Courts,
Report of the First Year (June 1984); Report of the New York Task Force
on Women in the Courts (Mar. 1986); Final Report of the Rhode Island
Supreme Court Committee on Women in the Courts (June 1987); Utah
Task Force on Gender and Justice, Report to the Utah Judicial Council
(Mar. 1990); Vermont Supreme Court and Vermont Bar Assn., Gender and
Justice: Report of the Vermont Task Force on Gender Bias in the Legal
System (Jan. 1991); Washington State Task Force on Gender and Justice

in the eight separate Reports issued by Congress and its committees over the long course leading to enactment.[8]  Cf. *Hodel*, 452 U. S., at 278–279 (noting "extended hearings," "vast amounts of testimony and documentary evidence," and "years of the most thorough legislative consideration").

With respect to domestic violence, Congress received evidence for the following findings:

> "Three out of four American women will be victims of violent crimes sometime during their life." H. R. Rep. No. 103–395, p. 25 (1993) (citing U. S. Dept. of Justice, Report to the Nation on Crime and Justice 29 (2d ed. 1988)).

> "Violence is the leading cause of injuries to women ages 15 to 44 . . . ." S. Rep. No. 103–138, p. 38 (1993) (citing Surgeon General Antonia Novello, From the Surgeon General, U. S. Public Health Services, 267 JAMA 3132 (1992)).

> "[A]s many as 50 percent of homeless women and children are fleeing domestic violence." S. Rep. No. 101–545, p. 37 (1990) (citing E. Schneider, Legal Reform Efforts for Battered Women: Past, Present, and Future (July 1990)).

> "Since 1974, the assault rate against women has outstripped the rate for men by at least twice for some age groups and far more for others." S. Rep. No. 101–

---

in the Courts, Final Report (1989); Wisconsin Equal Justice Task Force, Final Report (Jan. 1991).

[8] See S. Rep. No. 101–545 (1990); Majority Staff of Senate Committee on the Judiciary, Violence Against Women: The Increase of Rape in America, 102d Cong., 1st Sess. (Comm. Print 1991); S. Rep. No. 102–197 (1991); Majority Staff of Senate Committee on the Judiciary, Violence Against Women: A Week in the Life of America, 102d Cong., 2d Sess. (Comm. Print 1992); S. Rep. No. 103–138 (1993); Majority Staff of Senate Committee on the Judiciary, The Response to Rape: Detours on the Road to Equal Justice, 103d Cong., 1st Sess. (Comm. Print 1993); H. R. Rep. No. 103–395 (1993); H. R. Conf. Rep. No. 103–711 (1994).

545, at 30 (citing Bureau of Justice Statistics, Criminal Victimization in the United States (1974) (Table 5)).

"[B]attering 'is the single largest cause of injury to women in the United States.'" S. Rep. No. 101–545, at 37 (quoting Van Hightower & McManus, Limits of State Constitutional Guarantees: Lessons from Efforts to Implement Domestic Violence Policies, 49 Pub. Admin. Rev. 269 (May/June 1989).

"An estimated 4 million American women are battered each year by their husbands or partners." H. R. Rep. No. 103–395, at 26 (citing Council on Scientific Affairs, American Medical Assn., Violence Against Women: Relevance for Medical Practitioners, 267 JAMA 3184, 3185 (1992).

"Over 1 million women in the United States seek medical assistance each year for injuries sustained [from] their husbands or other partners." S. Rep. No. 101–545, at 37 (citing Stark & Flitcraft, Medical Therapy as Repression: The Case of the Battered Woman, Health & Medicine (Summer/Fall 1982).

"Between 2,000 and 4,000 women die every year from [domestic] abuse." S. Rep. No. 101–545, at 36 (citing Schneider, *supra*).

"[A]rrest rates may be as low as 1 for every 100 domestic assaults." S. Rep. No. 101–545, at 38 (citing Dutton, Profiling of Wife Assaulters: Preliminary Evidence for Trimodal Analysis, 3 Violence and Victims 5–30 (1988)).

"Partial estimates show that violent crime against women costs this country at least 3 billion—not million, but billion—dollars a year." S. Rep. No. 101–545, at 33 (citing Schneider, *supra*, at 4).

"[E]stimates suggest that we spend $5 to $10 billion a year on health care, criminal justice, and other social costs of domestic violence." S. Rep. No. 103–138, at

41 (citing Biden, Domestic Violence: A Crime, Not a Quarrel, Trial 56 (June 1993)).

The evidence as to rape was similarly extensive, supporting these conclusions:

"[The incidence of] rape rose four times as fast as the total national crime rate over the past 10 years." S. Rep. No. 101–545, at 30 (citing Federal Bureau of Investigation Uniform Crime Reports (1988)).

"According to one study, close to half a million girls now in high school will be raped before they graduate." S. Rep. No. 101–545, at 31 (citing R. Warshaw, I Never Called it Rape 117 (1988)).

"[One hundred twenty-five thousand] college women can expect to be raped during this—or any—year." S. Rep. No. 101–545, at 43 (citing testimony of Dr. Mary Koss before the Senate Judiciary Committee, Aug. 29, 1990).

"[T]hree-quarters of women never go to the movies alone after dark because of the fear of rape and nearly 50 percent do not use public transit alone after dark for the same reason." S. Rep. No. 102–197, p. 38 (1991) (citing M. Gordon & S. Riger, The Female Fear 15 (1989)).

"[Forty-one] percent of judges surveyed believed that juries give sexual assault victims less credibility than other crime victims." S. Rep. No. 102–197, at 47 (citing Colorado Supreme Court Task Force on Gender Bias in the Courts, Gender & Justice in the Colorado Courts 91 (1990)).

"Less than 1 percent of all [rape] victims have collected damages." S. Rep. No. 102–197, at 44 (citing report by Jury Verdict Research, Inc.).

" '[A]n individual who commits rape has only about 4 chances in 100 of being arrested, prosecuted, and found guilty of any offense.' " S. Rep. No. 101–545, at 33, n. 30

(quoting H. Feild & L. Bienen, Jurors and Rape: A Study in Psychology and Law 95 (1980)).

"Almost one-quarter of convicted rapists never go to prison and another quarter received sentences in local jails where the average sentence is 11 months." S. Rep. No. 103–138, at 38 (citing Majority Staff Report of Senate Committee on the Judiciary, The Response to Rape: Detours on the Road to Equal Justice, 103d Cong., 1st Sess., 2 (Comm. Print 1993)).

"[A]lmost 50 percent of rape victims lose their jobs or are forced to quit because of the crime's severity." S. Rep. No. 102–197, at 53 (citing Ellis, Atkeson, & Calhoun, An Assessment of Long-Term Reaction to Rape, 90 J. Abnormal Psych., No. 3, p. 264 (1981).

Based on the data thus partially summarized, Congress found that

"crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce . . . [,] by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products . . . ." H. R. Conf. Rep. No. 103–711, p. 385 (1994).

Congress thereby explicitly stated the predicate for the exercise of its Commerce Clause power. Is its conclusion irrational in view of the data amassed? True, the methodology of particular studies may be challenged, and some of the figures arrived at may be disputed. But the sufficiency of the evidence before Congress to provide a rational basis for the finding cannot seriously be questioned. Cf. *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180, 199 (1997)

("The Constitution gives to Congress the role of weighing conflicting evidence in the legislative process").

Indeed, the legislative record here is far more voluminous than the record compiled by Congress and found sufficient in two prior cases upholding Title II of the Civil Rights Act of 1964 against Commerce Clause challenges. In *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241 (1964), and *Katzenbach* v. *McClung,* 379 U. S. 294 (1964), the Court referred to evidence showing the consequences of racial discrimination by motels and restaurants on interstate commerce. Congress had relied on compelling anecdotal reports that individual instances of segregation cost thousands to millions of dollars. See Civil Rights—Public Accommodations, Hearings on S. 1732 before the Senate Committee on Commerce, 88th Cong., 1st Sess., App. V, pp. 1383–1387 (1963). Congress also had evidence that the average black family spent substantially less than the average white family in the same income range on public accommodations, and that discrimination accounted for much of the difference. H. R. Rep. No. 88–914, pt. 2, pp. 9–10, and Table II (1963) (Additional Views on H. R. 7152 of Hon. William M. McCulloch, Hon. John V. Lindsay, Hon. William T. Cahill, Hon. Garner E. Shriver, Hon. Clark MacGregor, Hon. Charles McC. Mathias, Hon. James E. Bromwell).

While Congress did not, to my knowledge, calculate aggregate dollar values for the nationwide effects of racial discrimination in 1964, in 1994 it did rely on evidence of the harms caused by domestic violence and sexual assault, citing annual costs of $3 billion in 1990, see S. Rep. 101–545, at 33, and $5 to $10 billion in 1993, see S. Rep. No. 103–138, at 41.[9] Equally important, though, gender-based violence in the 1990's was shown to operate in a manner similar to racial

[9] In other cases, we have accepted dramatically smaller figures. See, *e. g., Hodel* v. *Indiana,* 452 U. S. 314, 325, n. 11 (1981) (stating that corn production with a value of $5.16 million "surely is not an insignificant amount of commerce").

discrimination in the 1960's in reducing the mobility of employees and their production and consumption of goods shipped in interstate commerce. Like racial discrimination, "[g]ender-based violence bars its most likely targets— women—from full partic[ipation] in the national economy." *Id.*, at 54.

If the analogy to the Civil Rights Act of 1964 is not plain enough, one can always look back a bit further. In *Wickard*, we upheld the application of the Agricultural Adjustment Act to the planting and consumption of homegrown wheat. The effect on interstate commerce in that case followed from the possibility that wheat grown at home for personal consumption could either be drawn into the market by rising prices, or relieve its grower of any need to purchase wheat in the market. See 317 U. S., at 127–129. The Commerce Clause predicate was simply the effect of the production of wheat for home consumption on supply and demand in interstate commerce. Supply and demand for goods in interstate commerce will also be affected by the deaths of 2,000 to 4,000 women annually at the hands of domestic abusers, see S. Rep. No. 101–545, at 36, and by the reduction in the work force by the 100,000 or more rape victims who lose their jobs each year or are forced to quit, see *id.*, at 56; H. R. Rep. No. 103–395, at 25–26. Violence against women may be found to affect interstate commerce and affect it substantially.[10]

---

[10] It should go without saying that my view of the limit of the congressional commerce power carries no implication about the wisdom of exercising it to the limit. I and other Members of this Court appearing before Congress have repeatedly argued against the federalization of traditional state crimes and the extension of federal remedies to problems for which the States have historically taken responsibility and may deal with today if they have the will to do so. See Hearings before a Subcommittee of the House Committee on Appropriations, 104th Cong., 1st Sess., pt. 7, pp. 13–14 (1995) (testimony of JUSTICE KENNEDY); Hearings on H. R. 4603 before a Subcommittee of the Senate Committee on Appropriations, 103d Cong., 2d Sess., 100–107 (1994) (testimony of JUSTICES

## II

The Act would have passed muster at any time between *Wickard* in 1942 and *Lopez* in 1995, a period in which the law enjoyed a stable understanding that congressional power under the Commerce Clause, complemented by the authority of the Necessary and Proper Clause, Art. I, § 8, cl. 18, extended to all activity that, when aggregated, has a substantial effect on interstate commerce. As already noted, this understanding was secure even against the turmoil at the passage of the Civil Rights Act of 1964, in the aftermath of which the Court not only reaffirmed the cumulative effects and rational basis features of the substantial effects·test, see *Heart of Atlanta, supra,* at 258; *McClung, supra,* at 301–305, but declined to limit the commerce power through a formal distinction between legislation focused on "commerce" and statutes addressing "moral and social wrong[s]," *Heart of Atlanta, supra,* at 257.

The fact that the Act does not pass muster before the Court today is therefore proof, to a degree that *Lopez* was not, that the Court's nominal adherence to the substantial effects test is merely that. Although a new jurisprudence has not emerged with any distinctness, it is clear that some congressional conclusions about obviously substantial, cumulative effects on commerce are being assigned lesser values than the once-stable doctrine would assign them. These devaluations are accomplished not by any express repudiation of the substantial effects test or its application through the aggregation of individual conduct, but by supplanting rational basis scrutiny with a new criterion of review.

---

KENNEDY and SOUTER). The Judicial Conference of the United States originally opposed the Act, though after the original bill was amended to include the gender-based animus requirement, the objection was withdrawn for reasons that are not apparent. See Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess., 70–71 (1993).

Thus the elusive heart of the majority's analysis in these cases is its statement that Congress's findings of fact are "weakened" by the presence of a disfavored "method of reasoning." *Ante*, at 615. This seems to suggest that the "substantial effects" analysis is not a factual enquiry, for Congress in the first instance with subsequent judicial review looking only to the rationality of the congressional conclusion, but one of a rather different sort, dependent upon a uniquely judicial competence.

This new characterization of substantial effects has no support in our cases (the self-fulfilling prophecies of *Lopez* aside), least of all those the majority cites. Perhaps this explains why the majority is not content to rest on its cited precedent but claims a textual justification for moving toward its new system of congressional deference subject to selective discounts. Thus it purports to rely on the sensible and traditional understanding that the listing in the Constitution of some powers implies the exclusion of others unmentioned. See *Gibbons* v. *Ogden*, 9 Wheat. 1, 195 (1824); *ante*, at 610; The Federalist No. 45, p. 313 (J. Cooke ed. 1961) (J. Madison).[11] The majority stresses that Art. I, §8, enu-

---

[11] The claim that powers not granted were withheld was the chief Federalist argument against the necessity of a bill of rights. Bills of rights, Hamilton claimed, "have no application to constitutions professedly founded upon the power of the people, and executed by their immediate representatives and servants. Here, in strictness, the people surrender nothing, and as they retain every thing, they have no need of particular reservations." The Federalist No. 84, at 578. James Wilson went further in the Pennsylvania ratifying convention, asserting that an enumeration of rights was positively dangerous because it suggested, conversely, that every right not reserved was surrendered. See 2 J. Elliot, Debates in the Several State Conventions on the Adoption of the Federal Constitution 436–437 (2d ed. 1863) (hereinafter Elliot's Debates). The Federalists did not, of course, prevail on this point; most States voted for the Constitution only after proposing amendments and the First Congress speedily adopted a Bill of Rights. See *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 569 (1985) (Powell, J., dissenting). While that document protected a range of specific individual

merates the powers of Congress, including the commerce power, an enumeration implying the exclusion of powers not enumerated. It follows, for the majority, not only that there must be some limits to "commerce," but that some particular subjects arguably within the commerce power can be identified in advance as excluded, on the basis of characteristics other than their commercial effects. Such exclusions come into sight when the activity regulated is not itself commercial or when the States have traditionally addressed it in the exercise of the general police power, conferred under the state constitutions but never extended to Congress under the Constitution of the Nation, see *Lopez*, 514 U. S., at 566. *Ante*, at 615–616.

The premise that the enumeration of powers implies that other powers are withheld is sound; the conclusion that some particular categories of subject matter are therefore presumptively beyond the reach of the commerce power is, however, a non sequitur. From the fact that Art. I, § 8, cl. 3, grants an authority limited to regulating commerce, it follows only that Congress may claim no authority under that section to address any subject that does not affect commerce. It does not at all follow that an activity affecting commerce nonetheless falls outside the commerce power, depending on the specific character of the activity, or the authority of a State to regulate it along with Congress.[12] My dis-

rights against federal infringement, it did not, with the possible exception of the Second Amendment, offer any similarly specific protections to areas of state sovereignty.

[12] To the contrary, we have always recognized that while the federal commerce power may overlap the reserved state police power, in such cases federal authority is supreme. See, *e. g.*, *Lake Shore & Michigan Southern R. Co.* v. *Ohio*, 173 U. S. 285, 297–298 (1899) ("When Congress acts with reference to a matter confided to it by the Constitution, then its statutes displace all conflicting local regulations touching that matter, although such regulations may have been established in pursuance of a power not surrendered by the States to the General Government"); *United States* v. *California*, 297 U. S. 175, 185 (1936) ("[W]e look to the activities

agreement with the majority is not, however, confined to logic, for history has shown that categorical exclusions have proven as unworkable in practice as they are unsupportable in theory.

## A

Obviously, it would not be inconsistent with the text of the Commerce Clause itself to declare "noncommercial" primary activity beyond or presumptively beyond the scope of the commerce power. That variant of categorical approach is not, however, the sole textually permissible way of defining the scope of the Commerce Clause, and any such neat limitation would at least be suspect in the light of the final sentence of Art. I, § 8, authorizing Congress to make "all Laws . . . necessary and proper" to give effect to its enumerated powers such as commerce. See *United States* v. *Darby*, 312 U. S. 100, 118 (1941) ("The power of Congress . . . extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce"). Accordingly, for significant periods of our history, the Court has defined the commerce power as plenary, unsusceptible to categorical exclusions, and this was the view expressed throughout the latter part of the 20th century in the substantial effects test. These two conceptions of the commerce power, plenary and categorically limited, are in fact old rivals, and today's revival of their competition summons up familiar history, a brief reprise of which may be helpful in posing what I take to be the key question going to the legitimacy of the majority's decision to breathe new life into the approach of categorical limitation.

---

in which the states have traditionally engaged as marking the boundary of the restriction upon the federal taxing power. But there is no such limitation upon the plenary power to regulate commerce").

Chief Justice Marshall's seminal opinion in *Gibbons* v. *Ogden*, 9 Wheat., at 193–194, construed the commerce power from the start with "a breadth never yet exceeded," *Wickard* v. *Filburn*, 317 U. S., at 120. In particular, it is worth noting, the Court in *Wickard* did not regard its holding as exceeding the scope of Chief Justice Marshall's view of interstate commerce; *Wickard* applied an aggregate effects test to ostensibly domestic, noncommercial farming consistently with Chief Justice Marshall's indication that the commerce power may be understood by its exclusion of subjects, among others, "which do not affect other States," *Gibbons*, 9 Wheat., at 195. This plenary view of the power has either prevailed or been acknowledged by this Court at every stage of our jurisprudence. See, *e. g., id.*, at 197; *Nashville, C. & St. L. R. Co.* v. *Alabama*, 128 U. S. 96, 99–100 (1888); *Lottery Case*, 188 U. S. 321, 353 (1903); *Minnesota Rate Cases*, 230 U. S. 352, 398 (1913); *United States* v. *California*, 297 U. S. 175, 185 (1936); *United States* v. *Darby*, *supra*, at 115; *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S., at 255; *Hodel* v. *Indiana*, 452 U. S., at 324. And it was this understanding, free of categorical qualifications, that prevailed in the period after 1937 through *Lopez*, as summed up by Justice Harlan: " 'Of course, the mere fact that Congress has said when particular activity shall be deemed to affect commerce does not preclude further examination by this Court. But where we find that the legislators . . . have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end.' " *Maryland* v. *Wirtz*, 392 U. S. 183, 190 (1968) (quoting *Katzenbach* v. *McClung*, 379 U. S., at 303–304).

Justice Harlan spoke with the benefit of hindsight, for he had seen the result of rejecting the plenary view, and today's attempt to distinguish between primary activities affecting commerce in terms of the relatively commercial or noncommercial character of the primary conduct proscribed comes with the pedigree of near tragedy that I outlined in

*United States* v. *Lopez*, 514 U. S., at 603 (dissenting opinion).
In the half century following the modern activation of the
commerce power with passage of the Interstate Commerce
Act in 1887, this Court from time to time created categorical
enclaves beyond congressional reach by declaring such activ-
ities as "mining," "production," "manufacturing," and union
membership to be outside the definition of "commerce" and
by limiting application of the effects test to "direct" rather
than "indirect" commercial consequences.   See, *e. g., United
States* v. *E. C. Knight Co.*, 156 U. S. 1 (1895) (narrowly con-
struing the Sherman Antitrust Act in light of the distinction
between "commerce" and "manufacture"); *In re Heff,* 197
U. S. 488, 505–506 (1905) (stating that Congress could not
regulate the intrastate sale of liquor); *The Employers' Lia-
bility Cases*, 207 U. S. 463, 495–496 (1908) (invalidating law
governing tort liability for common carriers operating in
interstate commerce because the effects on commerce were
indirect); *Adair* v. *United States*, 208 U. S. 161 (1908) (hold-
ing that labor union membership fell outside "commerce");
*Hammer* v. *Dagenhart*, 247 U. S. 251 (1918) (invalidating
law prohibiting interstate shipment of goods manufactured
with child labor as a regulation of "manufacture"); *A. L. A.
Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 545–
548 (1935) (invalidating regulation of activities that only
"indirectly" affected commerce); *Railroad Retirement Bd.*
v. *Alton R. Co.*, 295 U. S. 330, 368–369 (1935) (invalidating
pension law for railroad workers on the grounds that con-
ditions of employment were only indirectly linked to com-
merce); *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 303–304
(1936) (holding that regulation of unfair labor practices in
mining regulated "production," not "commerce").

Since adherence to these formalistically contrived confines
of commerce power in large measure provoked the judicial
crisis of 1937, one might reasonably have doubted that
Members of this Court would ever again toy with a return
to the days before *NLRB* v. *Jones & Laughlin Steel Corp.*,

301 U. S. 1 (1937), which brought the earlier and nearly disastrous experiment to an end. And yet today's decision can only be seen as a step toward recapturing the prior mistakes. Its revival of a distinction between commercial and noncommercial conduct is at odds with *Wickard*, which repudiated that analysis, and the enquiry into commercial purpose, first intimated by the *Lopez* concurrence, see *Lopez*, *supra*, at 580 (opinion of KENNEDY, J.), is cousin to the intent-based analysis employed in *Hammer*, *supra*, at 271–272, but rejected for Commerce Clause purposes in *Heart of Atlanta*, *supra*, at 257, and *Darby*, 312 U. S., at 115.

Why is the majority tempted to reject the lesson so painfully learned in 1937? An answer emerges from contrasting *Wickard* with one of the predecessor cases it superseded. It was obvious in *Wickard* that growing wheat for consumption right on the farm was not "commerce" in the common vocabulary,[13] but that did not matter constitutionally so long as the aggregated activity of domestic wheat growing affected commerce substantially. Just a few years before

---

[13] Contrary to the Court's suggestion, *ante*, at 611, n. 4, *Wickard* v. *Filburn*, 317 U. S. 111 (1942), applied the substantial effects test to domestic agricultural production for domestic consumption, an activity that cannot fairly be described as commercial, despite its commercial consequences in affecting or being affected by the demand for agricultural products in the commercial market. The *Wickard* Court admitted that Filburn's activity "may not be regarded as commerce" but insisted that "it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce . . . ." *Id.*, at 125. The characterization of home wheat production as "commerce" or not is, however, ultimately beside the point. For if substantial effects on commerce are proper subjects of concern under the Commerce Clause, what difference should it make whether the causes of those effects are themselves commercial? Cf., *e. g.*, *National Organization for Women, Inc.* v. *Scheidler*, 510 U. S. 249, 258 (1994) ("An enterprise surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives"). The Court's answer is that it makes a difference to federalism, and the legitimacy of the Court's new judicially derived federalism is the crux of our disagreement. See *infra*, at 644–646.

*Wickard,* however, it had certainly been no less obvious that "mining" practices could substantially affect commerce, even though *Carter Coal Co., supra,* had held mining regulation beyond the national commerce power. When we try to fathom the difference between the two cases, it is clear that they did not go in different directions because the *Carter Coal* Court could not understand a causal connection that the *Wickard* Court could grasp; the difference, rather, turned on the fact that the Court in *Carter Coal* had a reason for trying to maintain its categorical, formalistic distinction, while that reason had been abandoned by the time *Wickard* was decided. The reason was laissez-faire economics, the point of which was to keep government interference to a minimum. See *Lopez, supra,* at 605–606 (SOUTER, J., dissenting). The Court in *Carter Coal* was still trying to create a laissez-faire world out of the 20th-century economy, and formalistic commercial distinctions were thought to be useful instruments in achieving that object. The Court in *Wickard* knew it could not do any such thing and in the aftermath of the New Deal had long since stopped attempting the impossible. Without the animating economic theory, there was no point in contriving formalisms in a war with Chief Justice Marshall's conception of the commerce power.

If we now ask why the formalistic economic/noneconomic distinction might matter today, after its rejection in *Wickard,* the answer is not that the majority fails to see causal connections in an integrated economic world. The answer is that in the minds of the majority there is a new animating theory that makes categorical formalism seem useful again. Just as the old formalism had value in the service of an economic conception, the new one is useful in serving a conception of federalism. It is the instrument by which assertions of national power are to be limited in favor of preserving a supposedly discernible, proper sphere of state autonomy to legislate or refrain from legislating as the in-

dividual States see fit. The legitimacy of the Court's current emphasis on the noncommercial nature of regulated activity, then, does not turn on any logic serving the text of the Commerce Clause or on the realism of the majority's view of the national economy. The essential issue is rather the strength of the majority's claim to have a constitutional warrant for its current conception of a federal relationship enforceable by this Court through limits on otherwise plenary commerce power. This conception is the subject of the majority's second categorical discount applied today to the facts bearing on the substantial effects test.

## B

The Court finds it relevant that the statute addresses conduct traditionally subject to state prohibition under domestic criminal law, a fact said to have some heightened significance when the violent conduct in question is not itself aimed directly at interstate commerce or its instrumentalities. *Ante,* at 609. Again, history seems to be recycling, for the theory of traditional state concern as grounding a limiting principle has been rejected previously, and more than once. It was disapproved in *Darby,* 312 U. S., at 123–124, and held insufficient standing alone to limit the commerce power in *Hodel,* 452 U. S., at 276–277. In the particular context of the Fair Labor Standards Act it was rejected in *Maryland* v. *Wirtz,* 392 U. S. 183 (1968), with the recognition that "[t]here is no general doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other." *Id.,* at 195 (internal quotation marks omitted). The Court held it to be "clear that the Federal Government, when acting within a delegated power, may override countervailing state interests, whether these be described as 'governmental' or 'proprietary' in character." *Ibid.* While *Wirtz* was later overruled by *National League of Cities* v. *Usery,* 426 U. S.

833 (1976), that case was itself repudiated in *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985), which held that the concept of "traditional governmental function" (as an element of the immunity doctrine under *Hodel*) was incoherent, there being no explanation that would make sense of the multifarious decisions placing some functions on one side of the line, some on the other. 469 U. S., at 546–547. The effort to carve out inviolable state spheres within the spectrum of activities substantially affecting commerce was, of course, just as irreconcilable with *Gibbons*'s explanation of the national commerce power as being as "absolut[e] as it would be in a single government," 9 Wheat., at 197.[14]

---

[14] The Constitution of 1787 did, in fact, forbid some exercises of the commerce power. Article I, § 9, cl. 6, barred Congress from giving preference to the ports of one State over those of another. More strikingly, the Framers protected the slave trade from federal interference, see Art. I, § 9, cl. 1, and confirmed the power of a State to guarantee the chattel status of slaves who fled to another State, see Art. IV, § 2, cl. 3. These reservations demonstrate the plenary nature of the federal power; the exceptions prove the rule. Apart from them, proposals to carve islands of state authority out of the stream of commerce power were entirely unsuccessful. Roger Sherman's proposed definition of federal legislative power as excluding "matters of internal police" met Gouverneur Morris's response that "[t]he internal police . . . ought to be infringed in many cases" and was voted down eight to two. 2 Records of the Federal Convention of 1787, pp. 25–26 (M. Farrand ed. 1911) (hereinafter Farrand). The Convention similarly rejected Sherman's attempt to include in Article V a proviso that "no state shall . . . be affected in its internal police." 5 Elliot's Debates 551–552. Finally, Rufus King suggested an explicit bill of rights for the States, a device that might indeed have set aside the areas the Court now declares off-limits. 1 Farrand 493 ("As the fundamental rights of individuals are secured by express provisions in the State Constitutions; why may not a like security be provided for the Rights of States in the National Constitution"). That proposal, too, came to naught. In short, to suppose that enumerated powers must have limits is sensible; to maintain that there exist judicially identifiable areas of state regulation immune to the plenary congressional commerce

The objection to reviving traditional state spheres of action as a consideration in commerce analysis, however, not only rests on the portent of incoherence, but is compounded by a further defect just as fundamental. The defect, in essence, is the majority's rejection of the Founders' considered judgment that politics, not judicial review, should mediate between state and national interests as the strength and legislative jurisdiction of the National Government inevitably increased through the expected growth of the national economy.[15]   Whereas today's majority takes a leaf from the book of the old judicial economists in saying that the Court should somehow draw the line to keep the federal relationship in a proper balance, Madison, Wilson, and Marshall understood the Constitution very differently.

Although Madison had emphasized the conception of a National Government of discrete powers (a conception that a number of the ratifying conventions thought was too indeterminate to protect civil liberties),[16] Madison himself must have sensed the potential scope of some of the powers granted (such as the authority to regulate commerce), for he

---

power even though falling within the limits defined by the substantial effects test is to deny our constitutional history.

[15] That the national economy and the national legislative power expand in tandem is not a recent discovery.   This Court accepted the prospect well over 100 years ago, noting that the commerce powers "are not confined to the instrumentalities of commerce, or the postal service known or in use when the Constitution was adopted, but they keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances."   *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1, 9 (1878).   See also, *e. g., Farmers Loan & Trust Co.* v. *Minnesota*, 280 U. S. 204, 211–212 (1930) ("Primitive conditions have passed; business is now transacted on a national scale").

[16] As mentioned in n. 11, *supra,* many state conventions voted in favor of the Constitution only after proposing amendments.   See 1 Elliot's Debates 322–323 (Massachusetts), 325 (South Carolina), 325–327 (New Hampshire), 327 (Virginia), 327–331 (New York), 331–332 (North Carolina), 334–337 (Rhode Island).

took care in The Federalist No. 46 to hedge his argument for limited power by explaining the importance of national politics in protecting the States' interests. The National Government "will partake sufficiently of the spirit [of the States], to be disinclined to invade the rights of the individual States, or the prerogatives of their governments." The Federalist No. 46, p. 319 (J. Cooke ed. 1961). James Wilson likewise noted that "it was a favorite object in the Convention" to secure the sovereignty of the States, and that it had been achieved through the structure of the Federal Government. 2 Elliot's Debates 438–439.[17] The Framers of the Bill of Rights, in turn, may well have sensed that Madison and Wilson were right about politics as the determinant of the federal balance within the broad limits of a power like commerce, for they formulated the Tenth Amendment without any provision comparable to the specific guarantees proposed for individual liberties.[18] In any case, this Court recognized the political component of federalism in the seminal *Gibbons* opinion. After declaring the plenary character of congressional power within the sphere of activity affecting commerce, the Chief Justice spoke for the Court in explaining that there was only one restraint on its valid exercise:

---

[17] Statements to similar effect pervade the ratification debates. See, *e. g.*, 2 *id.*, at 166–170 (Massachusetts, remarks of Samuel Stillman); 2 *id.*, at 251–253 (New York, remarks of Alexander Hamilton); 4 *id.*, at 95–98 (North Carolina, remarks of James Iredell).

[18] The majority's special solicitude for "areas of traditional state regulation," *ante*, at 615, is thus founded not on the text of the Constitution but on what has been termed the "*spirit* of the Tenth Amendment," *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S., at 585 (O'CONNOR, J., dissenting) (emphasis in original). Susceptibility to what Justice Holmes more bluntly called "some invisible radiation from the general terms of the Tenth Amendment," *Missouri* v. *Holland*, 252 U. S. 416, 434 (1920), has increased in recent years, in disregard of his admonition that "[w]e must consider what this country has become in deciding what that Amendment has reserved," *ibid.*

"The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments." *Gibbons*, 9 Wheat., at 197.

Politics as the moderator of the congressional employment of the commerce power was the theme many years later in *Wickard*, for after the Court acknowledged the breadth of the *Gibbons* formulation it invoked Chief Justice Marshall yet again in adding that "[h]e made emphatic the embracing and penetrating nature of this power by warning that effective restraints on its exercise must proceed from political rather than judicial processes." *Wickard*, 317 U. S., at 120 (citation omitted). Hence, "conflicts of economic interest . . . are wisely left under our system to resolution by Congress under its more flexible and responsible legislative process. Such conflicts rarely lend themselves to judicial determination. And with the wisdom, workability, or fairness, of the plan of regulation we have nothing to do." *Id.*, at 129 (footnote omitted).

As with "conflicts of economic interest," so with supposed conflicts of sovereign political interests implicated by the Commerce Clause: the Constitution remits them to politics. The point can be put no more clearly than the Court put it the last time it repudiated the notion that some state activities categorically defied the commerce power as understood in accordance with generally accepted concepts. After confirming Madison's and Wilson's views with a recitation of the sources of state influence in the structure of the National Constitution, *Garcia*, 469 U. S., at 550–552, the Court disposed of the possibility of identifying "principled constitutional limitations on the scope of Congress' Commerce Clause powers over the States merely

by relying on *a priori* definitions of state sovereignty," *id.*, at 548. It concluded that

> "the Framers chose to rely on a federal system in which special restraints on federal power over the States inhered principally in the workings of the National Government itself, rather than in discrete limitations on the objects of federal authority. State sovereign interests, then, are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power." *Id.*, at 552.

The *Garcia* Court's rejection of "judicially created limitations" in favor of the intended reliance on national politics was all the more powerful owing to the Court's explicit recognition that in the centuries since the framing the relative powers of the two sovereign systems have markedly changed. Nationwide economic integration is the norm, the national political power has been augmented by its vast revenues, and the power of the States has been drawn down by the Seventeenth Amendment, eliminating selection of senators by state legislature in favor of direct election.

The *Garcia* majority recognized that economic growth and the burgeoning of federal revenue have not amended the Constitution, which contains no circuit breaker to preclude the political consequences of these developments. Nor is there any justification for attempts to nullify the natural political impact of the particular amendment that was adopted. The significance for state political power of ending state legislative selection of senators was no secret in 1913, and the amendment was approved despite public comment on that very issue. Representative Franklin Bartlett, after quoting Madison's Federalist No. 62, as well as remarks by George Mason and John Dickinson during the Constitutional Convention, concluded, "It follows, therefore, that the

framers of the Constitution, were they present in this House to-day, would inevitably regard this resolution as a most direct blow at the doctrine of State's rights and at the integrity of the State sovereignties; for if you once deprive a State as a collective organism of all share in the General Government, you annihilate its federative importance." 26 Cong. Rec. 7774 (1894). Massachusetts Senator George Hoar likewise defended indirect election of the Senate as "a great security for the rights of the States." S. Doc. No. 232, 59th Cong., 1st Sess., 21 (1906). And Elihu Root warned that if the selection of senators should be taken from state legislatures, "the tide that now sets toward the Federal Government will swell in volume and power." 46 Cong. Rec. 2243 (1911). "The time will come," he continued, "when the Government of the United States will be driven to the exercise of more arbitrary and unconsidered power, will be driven to greater concentration, will be driven to extend its functions into the internal affairs of the States." *Ibid.* See generally Rossum, The Irony of Constitutional Democracy: Federalism, the Supreme Court, and the Seventeenth Amendment, 36 San Diego L. Rev. 671, 712–714 (1999) (noting federalism-based objections to the Seventeenth Amendment). These warnings did not kill the proposal; the Amendment was ratified, and today it is only the ratification, not the predictions, which this Court can legitimately heed.[19]

---

[19] The majority tries to deflect the objection that it blocks an intended political process by explaining that the Framers intended politics to set the federal balance only within the sphere of permissible commerce legislation, whereas we are looking to politics to define that sphere (in derogation even of *Marbury* v. *Madison*, 1 Cranch 137 (1803)), *ante*, at 616. But we all accept the view that politics is the arbiter of state interests only within the realm of legitimate congressional action under the commerce power. Neither Madison nor Wilson nor Marshall, nor the *Jones & Laughlin*, *Darby*, *Wickard*, or *Garcia* Courts, suggested that politics defines the commerce power. Nor do we, even though we recognize that the conditions of the contemporary world result in a vastly greater sphere

Amendments that alter the balance of power between the National and State Governments, like the Fourteenth, or that change the way the States are represented within the Federal Government, like the Seventeenth, are not rips in the fabric of the Framers' Constitution, inviting judicial repairs. The Seventeenth Amendment may indeed have lessened the enthusiasm of the Senate to represent the States as discrete sovereignties, but the Amendment did not convert the judiciary into an alternate shield against the commerce power.

## C

The Court's choice to invoke considerations of traditional state regulation in these cases is especially odd in light of a distinction recognized in the now-repudiated opinion for the Court in *Usery.* In explaining that there was no inconsistency between declaring the States immune to the commerce power exercised in the Fair Labor Standards Act, but subject to it under the Economic Stabilization Act of 1970, as decided in *Fry* v. *United States,* 421 U. S. 542 (1975), the Court spoke of the latter statute as dealing with a serious threat affecting all the political components of the fed-

---

of influence for politics than the Framers would have envisioned. Politics has legitimate authority, for all of us on both sides of the disagreement, only within the legitimate compass of the commerce power. The majority claims merely to be engaging in the judicial task of patrolling the outer boundaries of that congressional authority. See *ante,* at 616–617, n. 7. That assertion cannot be reconciled with our statements of the substantial effects test, which have not drawn the categorical distinctions the majority favors. See, *e. g., Wickard,* 317 U. S., at 125; *United States* v. *Darby,* 312 U. S. 100, 118–119 (1941). The majority's attempt to circumscribe the commerce power by defining it in terms of categorical exceptions can only be seen as a revival of similar efforts that led to near tragedy for the Court and incoherence for the law. If history's lessons are accepted as guides for Commerce Clause interpretation today, as we do accept them, then the subject matter of the Act falls within the commerce power and the choice to legislate nationally on that subject, or to except it from national legislation because the States have traditionally dealt with it, should be a political choice and only a political choice.

eral system, "which only collective action by the National Government might forestall." *Usery*, 426 U. S., at 853. Today's majority, however, finds no significance whatever in the state support for the Act based upon the States' acknowledged failure to deal adequately with gender-based violence in state courts, and the belief of their own law enforcement agencies that national action is essential.[20]

The National Association of Attorneys General supported the Act unanimously, see Violence Against Women: Victims of the System, Hearing on S. 15 before the Senate Committee on the Judiciary, 102d Cong., 1st Sess., 37–38 (1991), and Attorneys General from 38 States urged Congress to enact the Civil Rights Remedy, representing that "the current system for dealing with violence against women is inadequate," see Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess., 34–36 (1993). It was against this record of failure at the state level that the Act was passed to provide the choice of a federal forum in place of the state-court systems found inadequate to stop gender-biased violence. See Women and Violence, Hearing before the Senate Committee on the Judiciary, 101st Cong., 2d Sess., 2 (1990) (statement of Sen. Biden) (noting importance of federal forum).[21] The Act accordingly offers a federal civil rights remedy aimed exactly

---

[20] See n. 7, *supra.* The point here is not that I take the position that the States are incapable of dealing adequately with domestic violence if their political leaders have the will to do so; it is simply that the Congress had evidence from which it could find a national statute necessary, so that its passage obviously survives Commerce Clause scrutiny.

[21] The majority's concerns about accountability strike me as entirely misplaced. Individuals, such as the defendants in this action, haled into federal court and sued under the United States Code, are quite aware of which of our dual sovereignties is attempting to regulate their behavior. Had Congress chosen, in the exercise of its powers under §5 of the Fourteenth Amendment, to proceed instead by regulating the States, rather than private individuals, this accountability would be far less plain.

at violence against women, as an alternative to the generic state tort causes of action found to be poor tools of action by the state task forces. See S. Rep. No. 101–545, at 45 (noting difficulty of fitting gender-motivated crimes into common-law categories). As the 1993 Senate Report put it, "The Violence Against Women Act is intended to respond both to the underlying attitude that this violence is somehow less serious than other crime and to the resulting failure of our criminal justice system to address such violence. Its goals are both symbolic and practical . . . ." S. Rep. No. 103–138, at 38.

The collective opinion of state officials that the Act was needed continues virtually unchanged, and when the Civil Rights Remedy was challenged in court, the States came to its defense. Thirty-six of them and the Commonwealth of Puerto Rico have filed an *amicus* brief in support of petitioners in these cases, and only one State has taken respondents' side. It is, then, not the least irony of these cases that the States will be forced to enjoy the new federalism whether they want it or not. For with the Court's decision today, Antonio Morrison, like *Carter Coal*'s James Carter before him, has "won the states' rights plea against the states themselves." R. Jackson, The Struggle for Judicial Supremacy 160 (1941).

### III

All of this convinces me that today's ebb of the commerce power rests on error, and at the same time leads me to doubt that the majority's view will prove to be enduring law. There is yet one more reason for doubt. Although we sense the presence of *Carter Coal, Schechter,* and *Usery* once again, the majority embraces them only at arm's-length. Where such decisions once stood for rules, today's opinion points to considerations by which substantial effects are discounted. Cases standing for the sufficiency of substantial effects are not overruled; cases overruled since 1937 are not quite revived. The Court's thinking betokens less clearly

a return to the conceptual straitjackets of *Schechter* and *Carter Coal* and *Usery* than to something like the unsteady state of obscenity law between *Redrup* v. *New York*, 386 U. S. 767 (1967) *(per curiam)*, and *Miller* v. *California*, 413 U. S. 15 (1973), a period in which the failure to provide a workable definition left this Court to review each case ad hoc. See *id.*, at 22, n. 3; *Interstate Circuit, Inc.* v. *Dallas*, 390 U. S. 676, 706–708 (1968) (Harlan, J., dissenting). As our predecessors learned then, the practice of such ad hoc review cannot preserve the distinction between the judicial and the legislative, and this Court, in any event, lacks the institutional capacity to maintain such a regime for very long. This one will end when the majority realizes that the conception of the commerce power for which it entertains hopes would inevitably fail the test expressed in Justice Holmes's statement that "[t]he first call of a theory of law is that it should fit the facts." O. Holmes, The Common Law 167 (Howe ed. 1963). The facts that cannot be ignored today are the facts of integrated national commerce and a political relationship between States and Nation much affected by their respective treasuries and constitutional modifications adopted by the people. The federalism of some earlier time is no more adequate to account for those facts today than the theory of laissez-faire was able to govern the national economy 70 years ago.

JUSTICE BREYER, with whom JUSTICE STEVENS joins, and with whom JUSTICE SOUTER and JUSTICE GINSBURG join as to Part I–A, dissenting.

No one denies the importance of the Constitution's federalist principles. Its state/federal division of authority protects liberty—both by restricting the burdens that government can impose from a distance and by facilitating citizen participation in government that is closer to home. The question is how the judiciary can best implement that

original federalist understanding where the Commerce Clause is at issue.

## I

The majority holds that the federal commerce power does not extend to such "noneconomic" activities as "non-economic, violent criminal conduct" that significantly affects interstate commerce only if we "aggregate" the interstate "effect[s]" of individual instances. *Ante,* at 617. JUSTICE SOUTER explains why history, precedent, and legal logic militate against the majority's approach. I agree and join his opinion. I add that the majority's holding illustrates the difficulty of finding a workable judicial Commerce Clause touchstone—a set of comprehensible interpretive rules that courts might use to impose some meaningful limit, but not too great a limit, upon the scope of the legislative authority that the Commerce Clause delegates to Congress.

## A

Consider the problems. The "economic/noneconomic" distinction is not easy to apply. Does the local street corner mugger engage in "economic" activity or "noneconomic" activity when he mugs for money? See *Perez* v. *United States,* 402 U. S. 146 (1971) (aggregating local "loan sharking" instances); *United States* v. *Lopez,* 514 U. S. 549, 559 (1995) (loan sharking is economic because it consists of "intrastate extortionate credit transactions"); *ante,* at 610. Would evidence that desire for economic domination underlies many brutal crimes against women save the present statute? See United States General Accounting Office, Health, Education, and Human Services Division, Domestic Violence: Prevalence and Implications for Employment Among Welfare Recipients 7–8 (Nov. 1998); Brief for Equal Rights Advocates et al. as *Amicus Curiae* 10–12.

The line becomes yet harder to draw given the need for exceptions. The Court itself would permit Congress to aggregate, hence regulate, "noneconomic" activity taking place

at economic establishments. See *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241 (1964) (upholding civil rights laws forbidding discrimination at local motels); *Katzenbach* v. *McClung,* 379 U. S. 294 (1964) (same for restaurants); *Lopez, supra,* at 559 (recognizing congressional power to aggregate, hence forbid, noneconomically motivated discrimination at public accommodations); *ante,* at 610 (same). And it would permit Congress to regulate where that regulation is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez, supra,* at 561; cf. Controlled Substances Act, 21 U. S. C. § 801 *et seq.* (regulating drugs produced for home consumption). Given the former exception, can Congress simply rewrite the present law and limit its application to restaurants, hotels, perhaps universities, and other places of public accommodation? Given the latter exception, can Congress save the present law by including it, or much of it, in a broader "Safe Transport" or "Workplace Safety" act?

More important, why should we give critical constitutional importance to the economic, or noneconomic, nature of an interstate-commerce-affecting *cause?* If chemical emanations through indirect environmental change cause identical, severe commercial harm outside a State, why should it matter whether local factories or home fireplaces release them? The Constitution itself refers only to Congress' power to "regulate Commerce . . . among the several States," and to make laws "necessary and proper" to implement that power. Art. I, § 8, cls. 3, 18. The language says nothing about either the local nature, or the economic nature, of an interstate-commerce-affecting cause.

This Court has long held that only the interstate commercial effects, not the local nature of the cause, are constitutionally relevant. See *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 38–39 (1937) (focusing upon interstate effects); *Wickard* v. *Filburn,* 317 U. S. 111, 125 (1942) (aggregating

interstate effects of wheat grown for home consumption); *Heart of Atlanta Motel, supra,* at 258 ("'[I]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze'" (quoting *United States* v. *Women's Sportswear Mfrs. Assn.,* 336 U. S. 460, 464 (1949))). Nothing in the Constitution's language, or that of earlier cases prior to *Lopez,* explains why the Court should ignore one highly relevant characteristic of an interstate-commerce-affecting cause (how "local" it is), while placing critical constitutional weight upon a different, less obviously relevant, feature (how "economic" it is).

Most importantly, the Court's complex rules seem unlikely to help secure the very object that they seek, namely, the protection of "areas of traditional state regulation" from federal intrusion. *Ante,* at 615. The Court's rules, even if broadly interpreted, are underinclusive. The local pick-pocket is no less a traditional subject of state regulation than is the local gender-motivated assault. Regardless, the Court reaffirms, as it should, Congress' well-established and frequently exercised power to enact laws that satisfy a commerce-related jurisdictional prerequisite—for example, that some item relevant to the federally regulated activity has at some time crossed a state line. *Ante,* at 609, 611–612, 613, and n. 5; *Lopez, supra,* at 558; *Heart of Atlanta Motel, supra,* at 256 ("'[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question'" (quoting *Caminetti* v. *United States,* 242 U. S. 470, 491 (1917))); see also *United States* v. *Bass,* 404 U. S. 336, 347–350 (1971) (saving ambiguous felon-in-possession statute by requiring gun to have crossed state line); *Scarborough* v. *United States,* 431 U. S. 563, 575 (1977) (interpreting same statute to require only that gun passed "in interstate commerce" "at some time," without questioning constitutionality); cf., *e. g.,* 18 U. S. C. § 2261(a)(1) (making it a federal crime for a person to cross state lines to commit

a crime of violence against a spouse or intimate partner); § 1951(a) (federal crime to commit robbery, extortion, physical violence or threat thereof, where "article or commodity in commerce" is affected, obstructed, or delayed); § 2315 (making unlawful the knowing receipt or possession of certain stolen items that have "crossed a State . . . boundary"); § 922(g)(1) (prohibiting felons from shipping, transporting, receiving, or possessing firearms "in interstate . . . commerce").

And in a world where most everyday products or their component parts cross interstate boundaries, Congress will frequently find it possible to redraft a statute using language that ties the regulation to the interstate movement of some relevant object, thereby regulating local criminal activity or, for that matter, family affairs. See, e. g., Child Support Recovery Act of 1992, 18 U. S. C. § 228. Although this possibility does not give the Federal Government the power to regulate everything, it means that any substantive limitation will apply randomly in terms of the interests the majority seeks to protect. How much would be gained, for example, were Congress to reenact the present law in the form of "An Act Forbidding Violence Against Women Perpetrated at Public Accommodations or by Those Who Have Moved in, or through the Use of Items that Have Moved in, Interstate Commerce"? ´ Complex Commerce Clause rules creating fine distinctions that achieve only random results do little to further the important federalist interests that called them into being. That is why modern (pre-*Lopez*) case law rejected them. See *Wickard, supra,* at 120; *United States* v. *Darby,* 312 U. S. 100, 116–117 (1941); *Jones & Laughlin Steel Corp., supra,* at 37.

The majority, aware of these difficulties, is nonetheless concerned with what it sees as an important contrary consideration. To determine the lawfulness of statutes simply by asking whether Congress could reasonably have found that *aggregated* local instances significantly affect interstate commerce will allow Congress to regulate almost anything.

Virtually all local activity, when instances are aggregated, can have "substantial effects on employment, production, transit, or consumption." Hence Congress could "regulate any crime," and perhaps "marriage, divorce, and child-rearing" as well, obliterating the "Constitution's distinction between national and local authority." *Ante,* at 615, 616; *Lopez,* 514 U. S., at 558; cf. *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 548 (1935) (need for distinction between "direct" and "indirect" effects lest there "be virtually no limit to the federal power"); *Hammer* v. *Dagenhart,* 247 U. S. 251, 276 (1918) (similar observation).

This consideration, however, while serious, does not reflect a jurisprudential defect, so much as it reflects a practical reality. We live in a Nation knit together by two centuries of scientific, technological, commercial, and environmental change. Those changes, taken together, mean that virtually every kind of activity, no matter how local, genuinely can affect commerce, or its conditions, outside the State—at least when considered in the aggregate. *Heart of Atlanta Motel,* 379 U. S., at 251. And that fact makes it close to impossible for courts to develop meaningful subject-matter categories that would exclude some kinds of local activities from ordinary Commerce Clause "aggregation" rules without, at the same time, depriving Congress of the power to regulate activities that have a genuine and important effect upon interstate commerce.

Since judges cannot change the world, the "defect" means that, within the bounds of the rational, Congress, not the courts, must remain primarily responsible for striking the appropriate state/federal balance. *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528, 552 (1985); *ante,* at 645–649 (SOUTER, J., dissenting); *Kimel* v. *Florida Bd. of Regents,* 528 U. S. 62, 93–94 (2000) (STEVENS, J., dissenting) (Framers designed important structural safeguards to ensure that, when Congress legislates, "the normal operation of the legislative process itself would adequately defend

state interests from undue infringement"); see also Kramer, Putting the Politics Back into the Political Safeguards of Federalism, 100 Colum. L. Rev. 215 (2000) (focusing on role of political process and political parties in protecting state interests). Congress is institutionally motivated to do so. Its Members represent state and local district interests. They consider the views of state and local officials when they legislate, and they have even developed formal procedures to ensure that such consideration takes place. See, *e. g.*, Unfunded Mandates Reform Act of 1995, Pub. L. 104-4, 109 Stat. 48 (codified in scattered sections of 2 U. S. C.). Moreover, Congress often can better reflect state concerns for autonomy in the details of sophisticated statutory schemes than can the Judiciary, which cannot easily gather the relevant facts and which must apply more general legal rules and categories. See, *e. g.*, 42 U. S. C. § 7543(b) (Clean Air Act); 33 U. S. C. § 1251 *et seq.* (Clean Water Act); see also *New York* v. *United States*, 505 U. S. 144, 167–168 (1992) (collecting other examples of "cooperative federalism"). Not surprisingly, the bulk of American law is still state law, and overwhelmingly so.

## B

I would also note that Congress, when it enacted the statute, followed procedures that help to protect the federalism values at stake. It provided adequate notice to the States of its intent to legislate in an "are[a] of traditional state regulation." *Ante,* at 615. And in response, attorneys general in the overwhelming majority of States (38) supported congressional legislation, telling Congress that "[o]ur experience as Attorneys General strengthens our belief that the problem of violence against women is a national one, requiring federal attention, federal leadership, and federal funds." Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess., 34–36 (1993); see also Violence Against Women: Victims of

the System, Hearing on S. 15 before the Senate Committee on the Judiciary, 102d Cong., 1st Sess., 37–38 (1991) (unanimous resolution of the National Association of Attorneys General); but cf. Crimes of Violence Motivated by Gender, *supra*, at 77–84 (Conference of Chief Justices opposing legislation).

Moreover, as JUSTICE SOUTER has pointed out, Congress compiled a "mountain of data" explicitly documenting the interstate commercial effects of gender-motivated crimes of violence. *Ante*, at 628–635, 653–654 (dissenting opinion). After considering alternatives, it focused the federal law upon documented deficiencies in state legal systems. And it tailored the law to prevent its use in certain areas of traditional state concern, such as divorce, alimony, or child custody. 42 U. S. C. § 13981(e)(4). Consequently, the law before us seems to represent an instance, not of state/federal conflict, but of state/federal efforts to cooperate in order to help solve a mutually acknowledged national problem. Cf. §§ 300w–10, 3796gg, 3796hh, 10409, 13931 (providing federal moneys to encourage state and local initiatives to combat gender-motivated violence).

I call attention to the legislative process leading up to enactment of this statute because, as the majority recognizes, *ante*, at 614, it far surpasses that which led to the enactment of the statute we considered in *Lopez*. And even were I to accept *Lopez* as an accurate statement of the law, which I do not, that distinction provides a possible basis for upholding the law here. This Court on occasion has pointed to the importance of procedural limitations in keeping the power of Congress in check. See *Garcia, supra*, at 554 ("Any substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a 'sacred province of state autonomy'" (quoting *EEOC* v. *Wyoming*, 460 U. S. 226, 236 (1983))); see

also *Gregory* v. *Ashcroft,* 501 U. S. 452, 460–461 (1991) (insisting upon a "plain statement" of congressional intent when Congress legislates "in areas traditionally regulated by the States"); cf. *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 103–105, 114–117 (1976); *Fullilove* v. *Klutznick,* 448 U. S. 448, 548–554 (1980) (STEVENS, J., dissenting).

Commentators also have suggested that the thoroughness of legislative procedures—*e. g.,* whether Congress took a "hard look"—might sometimes make a determinative difference in a Commerce Clause case, say, when Congress legislates in an area of traditional state regulation. See, *e. g.,* Jackson, Federalism and the Uses and Limits of Law: *Printz* and Principle?, 111 Harv. L. Rev. 2180, 2231–2245 (1998); Gardbaum, Rethinking Constitutional Federalism, 74 Texas L. Rev. 795, 812–828, 830–832 (1996); Lessig, Translating Federalism: *United States* v. *Lopez,* 1995 S. Ct. Rev. 125, 194–214 (1995); see also Treaty Establishing the European Community Art. 5; Bermann, Taking Subsidiarity Seriously: Federalism in the European Community and the United States, 94 Colum. L. Rev. 331, 378–403 (1994) (arguing for similar limitation in respect to somewhat analogous principle of subsidiarity for European Community); Gardbaum, *supra,* at 833–837 (applying subsidiarity principles to American federalism). Of course, any judicial insistence that Congress follow particular procedures might itself intrude upon congressional prerogatives and embody difficult definitional problems. But the intrusion, problems, and consequences all would seem less serious than those embodied in the majority's approach. See *supra,* at 656–659.

I continue to agree with JUSTICE SOUTER that the Court's traditional "rational basis" approach is sufficient. *Ante,* at 628 (dissenting opinion); see also *Lopez,* 514 U. S., at 603–615 (SOUTER, J., dissenting); *id.,* at 615–631 (BREYER, J., dissenting). But I recognize that the law in this area is unstable and that time and experience may demonstrate both the unworkability of the majority's rules and the superiority

of Congress' own procedural approach—in which case the law may evolve toward a rule that, in certain difficult Commerce Clause cases, takes account of the thoroughness with which Congress has considered the federalism issue.

For these reasons, as well as those set forth by JUSTICE SOUTER, this statute falls well within Congress' Commerce Clause authority, and I dissent from the Court's contrary conclusion.

## II

Given my conclusion on the Commerce Clause question, I need not consider Congress' authority under §5 of the Fourteenth Amendment. Nonetheless, I doubt the Court's reasoning rejecting that source of authority. The Court points out that in *United States* v. *Harris*, 106 U. S. 629 (1883), and the *Civil Rights Cases*, 109 U. S. 3 (1883), the Court held that §5 does not authorize Congress to use the Fourteenth Amendment as a source of power to remedy the conduct of *private persons*. *Ante*, at 621–622. That is certainly so. The Federal Government's argument, however, is that Congress used §5 to remedy the actions of *state actors*, namely, those States which, through discriminatory design or the discriminatory conduct of their officials, failed to provide adequate (or any) state remedies for women injured by gender-motivated violence—a failure that the States, and Congress, documented in depth. See *ante*, at 630–631, n. 7, 653–654 (SOUTER, J., dissenting) (collecting sources).

Neither *Harris* nor the *Civil Rights Cases* considered this kind of claim. The Court in *Harris* specifically said that it treated the federal laws in question as "directed *exclusively* against the action of private persons, without reference to the laws of the State or their administration by her officers." 106 U. S., at 640 (emphasis added); see also *Civil Rights Cases, supra*, at 14 (observing that the statute did "not profess to be corrective of any constitutional wrong committed by the States" and that it established "rules for the conduct

of individuals in society towards each other, . . . without referring in any manner to any supposed action of the State or its authorities").

The Court responds directly to the relevant "state actor" claim by finding that the present law lacks "'congruence and proportionality'" to the state discrimination that it purports to remedy. *Ante,* at 625–626; see *City of Boerne* v. *Flores,* 521 U. S. 507, 526 (1997). That is because the law, unlike federal laws prohibiting literacy tests for voting, imposing voting rights requirements, or punishing state officials who intentionally discriminated in jury selection, *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966); *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966); *Ex parte Virginia,* 100 U. S. 339 (1880), is not "directed . . . at any State or state actor." *Ante,* at 626.

But why can Congress not provide a remedy against private actors? Those private actors, of course, did not themselves violate the Constitution. But this Court has held that Congress at least sometimes can enact remedial "[l]egislation . . . [that] prohibits conduct which is not itself unconstitutional." *Flores, supra,* at 518; see also *Katzenbach* v. *Morgan, supra,* at 651; *South Carolina* v. *Katzenbach, supra,* at 308. The statutory remedy does not in any sense purport to "determine what constitutes a constitutional violation." *Flores, supra,* at 519. It intrudes little upon either States or private parties. It may lead state actors to improve their own remedial systems, primarily through example. It restricts private actors only by imposing liability for private conduct that is, in the main, already forbidden by state law. Why is the remedy "disproportionate"? And given the relation between remedy and violation—the creation of a federal remedy to substitute for constitutionally inadequate state remedies—where is the lack of "congruence"?

The majority adds that Congress found that the problem of inadequacy of state remedies "does not exist in all States,

or even most States." *Ante*, at 626. But Congress had before it the task force reports of at least 21 States documenting constitutional violations. And it made its own findings about pervasive gender-based stereotypes hampering many state legal systems, sometimes unconstitutionally so. See, *e. g.*, S. Rep. No. 103–138, pp. 38, 41–42, 44–47 (1993); S. Rep. No. 102–197, pp. 39, 44–49 (1991); H. R. Conf. Rep. No. 103–711, p. 385 (1994). The record nowhere reveals a congressional finding that the problem "does not exist" elsewhere. Why can Congress not take the evidence before it as evidence of a national problem? This Court has not previously held that Congress must document the existence of a problem in every State prior to proposing a national solution. And the deference this Court gives to Congress' chosen remedy under § 5, *Flores, supra,* at 536, suggests that any such requirement would be inappropriate.

Despite my doubts about the majority's § 5 reasoning, I need not, and do not, answer the § 5 question, which I would leave for more thorough analysis if necessary on another occasion. Rather, in my view, the Commerce Clause provides an adequate basis for the statute before us. And I would uphold its constitutionality as the "necessary and proper" exercise of legislative power granted to Congress by that Clause.