LUTTIG, Circuit Judge,
dissenting:
I wrote extensively on the Supreme Court’s decision in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and on the Commerce Clause in the wake of that decision, in Brzonkala v. Virginia Polytechnic Institute, 169 F.3d 820 (4th Cir.1999). And the Supreme Court has now provided even further guidance for the lower courts through its decision in Brzonkala, which is ultimately styled in that court as United States v. Morrison, — U.S. ——•, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). If one holds the views expressed by the Supreme Court majority in Lopez and Morrison, and by our court in Brzonkala, a belabored discussion of the implications of those decisions for the regulation at issue before us today is not necessary.
Here, the Fish and Wildlife Service has promulgated a regulation that prohibits private landowners from shooting, wounding, killing, trapping, or otherwise harming the canis rufus, or the red wolf, even when the wolves are on the private landowners’ property and threatening their crops and livestock. However, in what the majority characterizes as an act of beneficence by the government to benefit the landowners, the government does allow a property owner — even on his own property — to kill a wolf if the wolf is about to kill the property owner himself or his family. Ante at 488. The question presented to us for decision is not “whether the national government can act to conserve scarce natural resources of value to our entire country,” ante at 486, whether we should “hold as a basic maxim of judicial restraint that Congress may constitutionally address the problem of protecting endangered species,” id. at 506, or whether our decision today will “work[ ] a rent in the fabric of Our Federalism,” id. at 505, “turn federalism on its head,” id., or “open the door to standardless judicial rejection of democratic initiatives of all sorts,” id. at 506. Rather, the simple (and frankly, considerably less incitant) question of law for us to decide is whether, assuming its validity under statute, this one particular Fish and Wildlife regulation exceeds Congress’ power under the Commerce Clause.
As the majority recites, there are an estimated 41 red wolves resident on private property and 75 red wolves total, in eastern North Carolina. The majority sustains the Fish and Wildlife’s regulation unhesitatingly on the ground that the taking of the 41 red wolves that might occur as property owners attempt to protect themselves and their families, their property, their crops, and their livestock from these wolves, will have a “substantial effect” on interstate commerce. This substantial effect on interstate commerce comprises, according to the majority, four *507 separate effects on such commerce, each of which the majority views as “substantial.”
First, the majority concludes, in exclusive reliance upon a Cornell University professor’s unpublished study entitled “Red Wolf Recovery in Northeastern North Carolina and the Great Smoky Mountains National Park,” that “[m]any tourists travel to North Carolina from throughout the country for ‘howling events’ — evenings of listening to wolf howls accompanied by educational programs,” id. at 493-94, and thus that the taking of these wolves will have a substantial effect on the interstate commercial industry of tourism.
Second, the majority concludes, largely in reliance, not upon their substantive conclusions, but rather upon the fact of the generation of two articles — “The Red Wolf as a Model for Carnivore Reintroductions,” which was published in the Symposium of the Zoological Society of London, and the 1994 unpublished study “Alligator River National Wildlife Refuge Red Wolf (Canis Rufus) Scat Analysis” — that the taking of these red wolves will have a substantial effect on the “interstate market” of “scientific research.” Ante at 494-95.
Third, the majority concludes, largely on the strength of an article that appears in the University of Pennsylvania Journal of International Economic Law, that the taking of these wolves will have a substantial effect on the majority-anticipated resurrection of an interstate trade in fur pelts. Ante at 495. In reliance upon an article that appeared two years ago in the Calgary Herald entitled “Hunters on Snowmobiles Cut Down Wolf Count in N.W.T.,” the majority observes that “[f]or example, in the Northwestern Territories of Canada where wolves are plentiful, a hunter can command about $300 per pelt.” Ante at 503. The majority frankly acknowledges that there has not been a trade in wolf pelts since the 1800s, ante at 495, but, to the majority, “this temporal difference is beside the point.” Id.
Finally, in reliance upon yet another unpublished study by Robert Esher and Theodore Simons entitled “Red Wolf Propagation on Horn Island, Mississippi: Red Wolf Ecological Studies,” and by analogy to the finding therein of “increased shore bird nesting, likely due to the reduction in raccoon predation,” ante at 495, the majority concludes that the red wolves which the fanners and landowners have heretofore thought threatened their families, their crops, and their livestock, actually help the farmers, by killing the animals that destroy the farmers’ crops, and thereby substantially affect interstate commerce. Ante at 495-96.
That these conclusions are not even arguably sustainable under Lopez, Morrison, and Brzonkala, much less for the reasons cobbled together by the majority, is evident from the mere recitation of the conclusions. The killing of even all 41 of the estimated red wolves that live on private property in North Carolina would not constitute an economic activity of the kind held by the Court in Lopez and in Morrison to be of central concern to the Commerce Clause, if it could be said to constitute an economic activity at all. Morrison, 120 S.Ct. at 1750 (“[A] fair reading of Lopez shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case.”). It is for this reason that the majority’s attempted aggregation is impermissible: “While we need not adopt a categorical rule against aggregating the effects of any non-economic activity in order to decide these cases, thus far in our Nation’s history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.” 120 S.Ct. at 1751 (citations omitted). But even assuming that such is an economic activity, it certainly is not an activity that has a substantial effect on interstate commerce. The number of inferences (not even to mention the amount of speculation) necessary to discern in this activity a substantial effect on interstate commerce is exponentially greater than the number necessary in Lopez to show a substantial effect on interstate commerce from the sale of guns *508 near schools or in Momson to show a substantial effect on interstate commerce from domestic assault. The number (and the speculation) is even greater than that necessary in Wiekard, v. Filbum, 317 U.S. Ill, 63 S.Ct. 82, 87 L.Ed. 122 (1942). And, it bears reminding, the regulated activity in Lopez and Wiekard at least was in some sense economic in character.
In a word, the expansive view of the Commerce power expressed by the majority today is closely akin to that separately expressed by Justice Breyer in his dissent in Lopez and Justice Souter in his dissent in Morrison, and certainly more closely akin to those dissenting Justices’ views than it is to the view of the Lopez majority in Lopez and Morrison. Indeed, all in all, it is a view far more expansive than that expressed by any of the dissenting Justices in either Lopez or Morrison — a fact confirmed by the dissents in Mom-son, ironically the case for which the majority herein unnecessarily held this case in abeyance. See Order of April 21, 2000 (Luttig, J., dissenting from abeyance order). It goes without saying that it is much more like that of the dissent in Brzonkala than that of the majority in our court. See Brzonkala v. Virginia Polytechnic Institute, 169 F.3d 820, 905 (Motz, J., dissenting).
Indeed, if the Supreme Court were to render tomorrow the identical opinion that the majority does today (not necessarily the decision, but the opinion, worded capaciously as it is), both Lopez and Morrison would be consigned to aberration. And, by deciding this case as it does, and on the particular reasoning that it does, the majority would have all but consigned to aberration our own decision in Brzonkala were it not for the Supreme Court’s recent affirmance of that decision.
I would invalidate this particular agency regulation under Lopez, Momson, and Brzonkala, and instead recognize as the aberration that action of invalidation, rather than the opinions in Lopez, Morrison, and Brzonkala, as does the majority. Compare Momson, 120 S.Ct. at 1773-74 (Souter, J., dissenting) (similarly to majority, characterizing Lopez and Morrison, and by implication Brzonkala, as aberrational vis-a-vis the sixty years of jurisprudence predating Lopez and predicting that Lopez and Momson will not be “enduring law”); see also Momson, 120 S.Ct. at 1777-78 (Breyer, J., dissenting) (“And even were I to accept Lopez as an accurate statement of the law, which I do not....”). I would do so without any fear whatsoever that such “would place in peril the entire federal regulatory scheme for wildlife and natural resource conservation,” ante at 504, as the majority over-rhetorically predicts would result from the invalidation of this lone regulation. No more so than in Brzonkala will “[mjaintaining the integrity of the enumerated powers” by invalidating this single regulation “mean that statutes will topple like falling dominos.” Brzonka-la, 169 F.3d at 897 (Wilkinson, J., concurring).
While it could be lost in a reading of the majority opinion, we do not address here Congress’ power over either the channels or instrumentalities of interstate commerce. We do not address activity that is interstate in character. We do not address in this case a statute or a regulation with an express interstate commerce jurisdictional requirement, which would all but ensure constitutional validity. We do not have before us an activity that has obvious economic character and impact, such as is typically the case with non-wildlife natural resources, and even with other wildlife resources. We are not even presented with an activity as to which a plausible case of future economic character and impact can be made.
To the contrary, we are confronted here with an administrative agency regulation of an activity that implicates but a handful of animals, if even that, in one small region of one state. An activity that not only has no current economic character, but one that concededly has had no economic character for well over a century now. An activity that has no foreseeable economic *509 character at all, except upon the baldest (though admittedly most humorous) of speculation that the red wolf pelt trade will once again emerge as a centerpiece of our Nation’s economy. And, importantly, an activity that Congress could plainly regulate under its spending power and under its power over federal lands, regardless.
Judge Wilkinson, for his part, has written that he regards Lopez, Brzonkala, and presumably now Morrison, as examples in a “spate of decisions” of “contemporary judicial activism,” Brzonkala, 169 F.3d 820, 892-93 (Wilkinson, J., concurring), as he similarly regards the Supreme Court’s decisions in Printz v. United States, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); City of Boeme v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); Seminole Tribe v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); and New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). See id. The dissenting Justices in both Lopez and Morrison similarly regal'd these decisions. See, e.g., Morrison, 120 S.Ct. at 1759 (Souter, J., dissenting); see also Morrison, 120 S.Ct. at 1773-74 (Breyer, J., dissenting). But I do not regard these decisions as such, and I certainly do not understand the majority of the Supreme Court to so regard these decisions.
Nor, in the wake of Lopez and Morrison, can I accept my colleagues’ view of the appropriate role of the judiciary in Commerce Clause disputes. As Judge Wilkinson’s view of Lopez mirrors that of the dissenters in Lopez and Morrison, so also does my colleagues’ view of the judiciary’s role in Commerce Clause conflicts mirror that of the Lopez and Morrison dissenters. The majority herein, like the dissents in both Lopez and Momson, takes the view that the political processes are the safeguard against federal encroachment upon the states. Thus, the majority concludes its opinion: “The political, not the judicial, process is the appropriate arena for the resolution of this particular dispute.” See ante at 506. Accord Morrison, 120 S.Ct. at 1768-69 (Souter, J., dissenting) (“The defect, in essence, is the majority’s rejection of the Founders’ considered judgment that politics, not judicial review, should mediate between state and national interests ....”); id. at 1769 (“As with ‘conflicts of economic interest,’ so with supposed conflicts of sovereign political interests implicated by the Commerce Clause: the Constitution remits them to politics.”); id. (Breyer, J., dissenting) (citing Souter, J., dissenting, in Morrison; Stevens, J., dissenting, in Kimel v. Florida Bd. of Regents, 528 U.S. -, 120 S.Ct. 631, 145 L.Edüd 522 (2000); and Black-mun, J., for the court, in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)).
The majority of the Supreme Court in Lopez and Morrison has left no doubt, however, that the interpretation of this clause of the Constitution, no less so than any other, must ultimately rest not with the political branches, but with the judiciary. See Lopez, 514 U.S. 549, 557 n. 2, 115 S.Ct. 1624, 131 L.Ed.2d 626 (“[Wjhether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court.”) (quoting Heart of Atlanta Motel v. United States, 379 U.S. 241, 273, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (Black, J., concurring)); Morrison, 120 S.Ct. at 1753 n. 7 (“Departing from their parliamentary past, the Framers adopted a written Constitution that further divided authority at the federal level so that the Constitution’s provisions would not be defined solely by the political branches nor the scope of legislative power limited only by public opinion and the legislature’s self-restraint. See, e.g., Mar-burg v. Madison, 1 Cranch 137, 176, 2 L.Ed. 60 (1803) (Marshall, C.J.).”).
Accordingly, I would faithfully apply in this case the Supreme Court’s landmark decisions in Lopez and Morrison, as I *510 would in any other case. The affirmative reach and the negative limits of the Commerce Clause do not wax and wane depending upon the subject matter of the particular legislation under challenge.